EDWARD S. SMITH, Circuit Judge.
 

 In this corporate/individual tax case appellants (Garvey,
 
 et al.)
 
 appeal from a judgment of the United States Claims Court dismissing their petitions for recovery of certain corporate taxes paid as a result of filing consolidated returns; certain individual taxes paid on income received under an unsecured private annuity contract; and corporate taxes paid on the computed interest portion of the annuity payments. We affirm on all substantive issues.
 

 Issues
 

 The major corporate tax issue is whether the investment account adjustment provision
 
 [1]
 
 of the consolidated return regulations was valid as applied to the Garvey
 
 [2]
 
 affiliated corporations which had a low carryover basis resulting from a pre-affiliation stock-for-stock (“B”) reorganization.
 
 [3]
 
 Subsidiary issues concern: whether, assuming the Commissioner of Internal Revenue (Commissioner) did correctly apply the regulation, he is nevertheless estopped from enforcing it against Garvey; and whether a variance
 
 [4]
 
 exists in the corporate tax issue. The major individual tax question is whether the annuitant-Garveys may recover their respective bases before recognizing gain resulting from the transfer of appreciated property as consideration for an unsecured private annuity contract, as contended by taxpayers, or whether, as the Government asserts, the Garveys must report the gain ratably with their bases.
 
 [5]
 
 A further issue is whether the corporate obligor on the annuity contract is entitled to deduct the computed interest portion of the annuity payments.
 
 [6]
 

 Background
 

 The facts material to this appeal are as follows:
 
 [7]
 
 from 1966 to 1972 the Garvey group of affiliated corporations filed consolidated tax returns. During this time one of the affiliated corporations twice distributed stock as dividends to other affiliated corporations in an amount totaling over $4.9 million. Because these distributions were made from earnings and profits accumulated
 
 prior
 
 to affiliation, the investment adjustment provisions of the consolidated return regulations
 
 [8]
 
 required Garvey to reduce the distributing corporation’s stock basis by the same amount. The stock basis in this case was the original shareholders’ low $0.25 million carried over as a result of the corporation’s having been brought into the Garvey group in a stock-for-stock (“B”) reorganization. Subtracting the $4.9 million
 
 *1571
 
 in distributions from a basis of only $0.25 million resulted in a sizable negative adjusted figure. When the Garvey group disaffiliated in 1972, the Commissioner claimed the resultant figure as an “excess loss account”
 
 [9]
 
 which produced a deficiency of nearly $1.4 million in corporate income tax. Garvey, however, protested the negative adjustment and resulting tax liability for the reasons summarized below, paid the tax, filed a timely claim for refund, and sued for recovery.
 

 Meanwhile, in 1969, the Garvey individuals transferred appreciated property to one or another of the Garvey corporations in exchange for the corporation’s unsecured promise to pay the transferor a stated sum annually for the remainder of the transfer- or/annuitant’s life. The amount of the annual payment was determined by dividing the independently appraised value of the property by the appropriate life expectancy factor, including an assumed interest rate of 3.5 percent. The Commissioner asserts that each annual annuity payment consists of three parts: return of basis, capital gain, and ordinary income, to be taxed accordingly. The Garveys claim that they should not have to recognize and pay tax on the property’s gain until they first shall have recovered their bases. Hence an issue of
 
 when,
 
 not whether, to recognize the gain in the appreciated property arose,
 
 i.e.,
 
 before or after recovery of basis. The corporate obligors on the annuities also claimed the right to deduct on their returns the 3.5 percent assumed interest element included in each annuity payment. All Garvey individual taxpayers paid the deficiencies attributed to the annuity payments, filed timely claims for refund, and sued for recovery.
 

 Discussion
 

 The parties stipulated below all facts regarding these issues; this court therefore faces questions of law which it has analyzed independently.
 

 The Affiliated Corporations
 

 Garvey contends that the Government’s strict and literal interpretation of Treas.Reg. § 1.1502-32(b)(2)(iii)(b) unfairly penalizes Garvey by creating “phantom” income which would not have been taxed had the Garvey group filed separate returns. The tax-avoidance objective of the consolidated return adjustment rules makes sense where the bases of affiliated corporations include pre-affiliation earnings and profits, Garvey contends, but not where such bases exclude such earlier gain, as has occurred in Garvey’s case because of its prior “B” reorganization. While Garvey legitimately points out an incongruity in the across-the-board application of this regulation, in asking for an exception Garvey is in effect asking the Commissioner to ignore his statutory mandate to require carryover basis in stock-for-stock reorganizations. This the Commissioner cannot do, and Garvey is caught between the rock and hard spot of electing the benefits of consolidated returns, with the concomitant disadvantage of paying tax upon an excess loss account at disaffiliation, or opting for continued separate return status. As Judge Philip Miller has succinctly noted, “the affiliated group that voluntarily elects to file a consolidated return ‘must now take the bitter with the sweet.’ ”
 
 Garvey, Inc. v. United States,
 
 1 Cl.Ct. 108, 116 (Cl.Ct.1983), citing
 
 Georgia-Pacific Corp. v. Commissioner,
 
 63 T.C. 790, 802 (1975). For the reasons correctly and more fully set forth in the opinion below, we affirm the Claims Court on this issue.
 

 Garvey also argues that the Commissioner is estopped from literal application of Treas.Reg. § l-1502.32(b)(2)(iii)(b) because in 1968 and 1971 the Treasury Department published proposals to amend the regulation to create an exception in the Garvey-type situation. Diming this period the existing investment adjustment regulations, which had been published in final form in 1966, were in effect. We agree with the lower court that Garvey’s estoppel
 
 *1572
 
 argument cannot prevail over
 
 existing
 
 regulations, and that its distribution of nearly $5 million in dividends in the hope that the
 
 proposed
 
 regulations would be adopted was nothing more than that — a hope.
 
 [10]
 

 Finally, the court below found a variance in Garvey’s section 243 dividend taxation argument
 
 [11]
 
 because it attacked the validity of the investment adjustment rules
 
 generally
 
 rather than their application to Garvey’s particular carryover basis situation. Garvey’s counsel in oral argument before this court stressed that Garvey rests on its briefs, which attack Treas.Reg. § 1.1502-32(b)(2)(iii)(b) as specifically interpreted and applied against Garvey, and counsel for the United States has conceded that Garvey’s attack extends no further. Hence, no variance exists.
 
 [12]
 

 The Individuals
 

 Regarding their unsecured private annuity income, the Garveys (annuitants) contend that they should not have to recognize gain on that income until they have recovered their bases in the appreciated property constituting their investment in the annuity contract. The Garveys base their position on a two-step argument: first, that the numerator of the “exclusion ratio”
 
 [13]
 
 should
 

 be the fair market value and not the adjusted basis of the property, and second, that the unsecured annuity constitutes an “open” rather than “closed” transaction in which no one knows or can reasonably speculate at the time of the transaction (nor until the annuitants die) the amount that will be realized.
 

 The Garveys’ emphasis on the “exclusion ratio” issue is misplaced, for regardless of whether the numerator of that ratio is the transferred property’s fair market value or its adjusted basis, the Commissioner may calculate taxation of the gain rat-ably either way.
 
 [14]
 
 The real problem is that the statute dealing with taxation of annuities (I.R.C. § 72) is silent as to how to treat the gain element of appreciated property.
 
 [15]
 
 Consequently, we turn to the provisions on realization and recognition of gain, section 1001 of the code, for guidance:
 

 Sec. 1001. Determination of amount of and recognition of gain or loss.
 

 (a) Computation of gain or loss
 

 The gain from the sale or other disposition of property shall be the excess of the
 
 amount realized
 
 therefrom over the adjusted basis * * *.
 

 (b) Amount realized
 

 
 *1573
 
 The
 
 amount realized
 
 from the sale or other disposition of property shall be the sum of any money received plus the
 
 fair market value
 
 of the property (other than money) received. * * *
 

 (c) Recognition of gain or loss
 

 Except as otherwise provided in this subtitle, the entire amount of the gain * * * on the sale or exchange of property shall be
 
 recognized.
 
 [Emphasis supplied.]
 

 In the instant case the Garveys have disposed of appreciated property, on which independent appraisers set a fair market value, in exchange for an annuity contract consisting of a corporation’s unsecured promise to pay the annuitant a set annual sum for the rest of the annuitant’s life. The amount of the annual sum has been carefully calculated in relation to each annuitant’s life expectancy and the property’s fair market value.
 
 [16]
 
 Does this piece of property, the unsecured annuity contract, which the Garvey annuitant is promised, have an ascertainable fair market value such that section 1001 is called into play, or is its value so speculative and contingent upon unknown future events
 
 (e.g.,
 
 the obligor’s solvency, the annuitant’s lifetime) that we must “wait and see” before we realize and recognize gain?
 

 The Garveys argue that the Government must “wait and see” on the basis of
 
 Burnet v. Logan,
 
 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143 (1931), in which the Supreme Court found that a steel company’s obligation to pay Mrs. Logan a set amount per ton of ore mined, in consideration of certain stock, was so contingent upon unpredictable future events that no value could be assigned it and Mrs. Logan’s gain could not be deemed realized and recognized, until she had in fact recovered her basis in the stock.
 
 [17]
 
 In other words, the transaction was open, not closed, just as the Garveys argue here.
 
 [18]
 
 The Government counters and the Claims Court has agreed, that in the annuity context, where Congress has enacted a prorated scheme for taxation of income, the open transaction doctrine is at least displaced.
 

 We find the latter argument persuasive and affirm the opinion below. Granted, a tension exists for cash basis taxpayers such as the Garveys in the interplay between the statutory annuity taxation scheme (section 72) and the statutory principles for realization and recognition of gain (section 1001), where uncertainties such as life expectancies and the obligor’s ability to pay cause the ascertaining of a property’s fair market value to constitute no more than a statistically intelligent guess. In enacting section 72, however, Congress has shown that it favors predictability of tax liability for the individual over precision in determining gain, based on the rational expectation that over time and throughout the aggregate taxpaying populace individual inequities will average out and the general revenue will be protected.
 
 [19]
 
 This may little console the Garveys, but, as we have seen in the consolidated return issue above, the tax code constitutes an intricate, intertwined, and not always perfectly balanced mechanism.
 
 [20]
 

 
 *1574
 

 The Interest Deduction
 

 Finally, the Garveys contend that the corporate obligors on their annuity contracts are entitled to deduct, pursuant to section 163, the computed interest portion of the annuity payments. This portion derives from the standard statistical table used to calculate the amount of consideration transferred to the annuitant, which table includes an assumption that the fund or asset would be able to earn 3.5 percent interest during the annuity period. The Government counters that the obligor on a private annuity, granted in exchange for property, makes payments which are both capital in nature and contingent on the annuitant’s life span, such that no fixed debt exists upon which “interest on indebtedness” could be deducted pursuant to section 163. The Government also cites section 483(f) of the Internal Revenue Code, providing an exception for annuities to a general provision allowing treatment as interest for some portions of deferred payments made on an exchange of property. The Claims Court has considered these arguments and held, with the weight of most authority, that the deduction is not allowed. We likewise have reviewed this matter and, for the reasons set forth in the Claims Court opinion,
 
 [21]
 
 affirm.
 

 Conclusion
 

 Having considered anew all of appellants’ contentions set forth before this court, we find them insufficient in merit to warrant reversal of the judgment below.
 

 AFFIRMED.
 

 [1]
 

 . Treas.Reg. § 1.1502-32(b)(2)(iii)(b), T.D. 6909, 1967-1, C.B. 240, promulgated pursuant to § 1502 of the Internal Revenue Code of 1954 (I.R.C. or the code) (26 U.S.C.). (Hereinafter all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable year in issue.)
 

 [2]
 

 . “Garvey” will be used in this opinion to refer to corporate or individual appellants as is evident from context.
 

 [3]
 

 . See I.R.C. §§ 368(a)(1)(B) and 362(b) regarding, respectively, “B” reorganizations and carryover basis.
 

 [4]
 

 . See I.R.C. § 7422(a); Treas.Reg. § 301.-6402-2 (1978).
 

 [5]
 

 .
 
 See
 
 I.R.C. § 72.
 

 [6]
 

 .
 
 See
 
 I.R.C. § 163.
 

 [7]
 

 . A complete statement of the facts is contained in the decision below by Judge Miller.
 
 Cf. Garvey, Inc. v. United States,
 
 1 Cl.Ct. 108 (Cl.Ct.1983). The pertinent statutes and regulations are set forth there in full or in part, and are not fully repeated here.
 

 [8]
 

 . See note 1,
 
 supra.
 
 The purpose of such an adjustment is to prevent tax avoidance through the use of consolidated returns to shelter preaffiliation earnings and profits.
 
 Garvey,
 
 1 Cl.Ct. at 110-15.
 

 [9]
 

 .
 
 See
 
 Treas.Reg. § 1.1502-32(e)(1), T.D. 6909, 1967-1, C.B. 240, set forth in
 
 Garvey,
 
 1 Cl.Ct. at 111.
 

 [10]
 

 . Garvey draws this court’s attention to a recent Tax Court case,
 
 Elkins v. Commissioner,
 
 81 T.C. 669 (1983), in which that court held that a taxpayer rightly relied on a reasonable interpretation of a term in a proposed regulation which was subsequently retroactively applied, and that the Commissioner could not fairly sustain his retroactive application of that proposed regulation as regarded the scope of the ambiguous term, in a manner broader than a taxpayer reasonably could have expected when the regulation was proposed. Unlike the case at bar,
 
 Elkins
 
 falls squarely in that category of cases discussed by Judge Miller in which there exists the “reasonably justifiable conduct” necessary to create an estoppel.
 
 Garvey,
 
 1 Ct.Cl. at 118.
 

 [11]
 

 .
 
 See Garvey,
 
 1 Cl.Ct. at 116-18. A variance is a prohibited discrepancy between the claim raised before the Treasury and the claim raised in court.
 
 Id.
 
 at 117; note 4,
 
 supra.
 

 [12]
 

 . We therefore have considered Garvey’s § 243 argument, as has Judge Miller, and find it unpersuasive as regards Garvey’s attack on the interpretation and application of Treas.Reg. § 1.1502.32(b)(2)(iii)(b).
 
 Garvey,
 
 1 Cl.Ct. at 116.
 

 [13]
 

 .
 
 See
 
 § 72(b), set forth at
 
 Garvey,
 
 1 Cl.Ct. at 121.
 

 [14]
 

 . Judge Miller has correctly discussed this below.
 
 Id.
 
 Moreover, two cases which the Garveys have cited in support of this argument,
 
 Estate of Bell v. Commissioner,
 
 60 T.C. 469 (1973), and
 
 212 Corp. v. Commissioner, 70
 
 T.C. 788 (1978), are actually adverse. While in both the Tax Court found that the numerator of the exclusion ratio is indeed the fair market value, the court then proceeded to tax the realized gain “up
 
 front”
 
 — i.e., the year of the annuity transaction. Both of these cases concerned secured, closed transactions, and in each six judges dissented.
 
 See Garvey, 1
 
 Cl.Ct. at 125-26.
 

 [15]
 

 . See § 72(c)(1)(A), set forth in
 
 Garvey
 
 at 121, defining the “investment in the [annuity] contract” as the “consideration paid” for the contract. This does not address the specific problem of appreciated property used as the consideration paid.
 

 [16]
 

 . See table setting forth basic figures,
 
 Garvey,
 
 1 Cl.Ct. at 120.
 

 [17]
 

 . After she had recovered her basis, Mrs. Logan would receive ordinary income, since this was well before the tax law differentiated between capital gain and ordinary income.
 
 Garvey,
 
 1 Cl.Ct. at 122. By contrast, the Garveys here consent to taxation of part of their annual annuity payments as ordinary income pursuant to §
 
 72
 
 — i.e., the difference between the gross payment and the exclusion ratio.
 

 [18]
 

 . The Garveys also emphasize that they, like Mrs. Logan, are cash basis taxpayers, such that the taxpayer must actually
 
 receive
 
 the property in a cash equivalent form before any gain can be realized. See §§ 451(a), 1001(b).
 

 [19]
 

 .
 
 See
 
 Judge Miller’s excellent discussion of the legislative intent and history of § 72.
 
 Garvey,
 
 1 Cl.Ct. at 123-25. We also note, as has Judge Miller, that since in the years at issue the Garveys have not died before nor outlived their life expectancies, we need not address their unconstitutionality argument.
 
 Id
 
 at 126.
 

 [20]
 

 .
 
 Burnet v. Logan,
 
 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143 (1931), also involved an additional indeterminable quantitative factor not present in the instant
 
 case
 
 — i.e., the number of tons of ore underlying the value of the consideration paid for Mrs. Logan’s annuity. Admittedly there are fairly reliable ways of estimating the quantity of ore in a mineral deposit, but it is not likely that the dismal accuracy of actuaries in predicting the collective mortality
 
 *1574
 
 of mere humans will ever be applied to provide any such mineral estimate on a rational basis.
 

 [21]
 

 .
 
 Garvey, 1
 
 Cl.Ct. at 126-28.