**STANDARD BRANDS LIQUIDATING CREDITOR TRUST, et al.,**
**Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 00–188T.

United States Court of Federal Claims.

July 19, 2002.

Thomas F. Joyce, Chicago, Illinois, for the plaintiff Standard Brands Liquidating Creditor Trust. With him on briefs were Michael Yentikoff, David F. Heroy, of counsel.

Rozella A. Oliver, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, for the United States. With her on briefs were Eileen J. O'Connor, Assistant Attorney General, Mildred L. Seidman, Chief, Court of Federal Claims Section, Stuart J. Bassin, Senior Trial Attorney, of counsel.

## OPINION

BRUGGINK, Judge.

Pending in this income refund claim are plaintiffs' motion for summary judgment and defendant's cross-motion for summary judgment. Oral argument was held on July 16, 2002. The issue presented is the deductibility of certain bankruptcy expenses as "specified liability losses" under 26 U.S.C. ("I.R.C.") § 172(b)(1)(C) (1994). For the reasons set out below, the government's cross-motion is granted.

## BACKGROUND

Standard Brands Paint Company and its subsidiaries (collectively referred to as "Standard Brands") manufactured, distributed, and sold paint and related products in retail stores. Standard Brands petitioned the United States Bankruptcy Court for the Central District of California for relief under Chapter 11 of Title 11 of the United States Code on February 11, 1992. On February 27, 1992, the Assistant United States Trustee responsible for the first bankruptcy appointed an "Official Committee of Creditors Holding Unsecured Claims" ("creditors' committee"). This appointment was made pursuant to 11 U.S.C. § 1102(a)(1). On March 3, 1993, Standard Brands filed with the bankruptcy court a plan of reorganization which would allow Standard Brands and its subsidiaries to continue to operate as going concerns.

During the first bankruptcy, under the supervision of the bankruptcy court, both Standard Brands and the creditors' committee employed various legal, accounting, and other professionals who incurred fees and expenses. The committee was authorized by law to make such engagements. *Id.* § 1103(a). The bankruptcy court entered awards of final compensation to the various professionals in September 1993. In its federal income tax returns for the taxable years ending January 1993 and January 1994, Standard Brands deducted some of the professional fees and expenses resulting from the first bankruptcy and capitalized the re-

maining $5,429,186 ("capitalized bankruptcy costs").[1]

In December 1995, Standard Brands filed for bankruptcy for a second time; this time as a liquidation. A going out of business sale was approved by the bankruptcy court on June 14, 1996. Most of Standard Brands' inventory was liquidated by the time it ceased retail operations in August 1996. Under the second bankruptcy plan, all of Standard Brands' property, proceeds, claims, and actions were assigned to the Standard Brands Liquidating Creditor Trust ("Liquidating Creditor Trust").

On August 10, 1998, Standard Brands filed a Form 1120X ("Claim") for the taxable year ending January 1987. The claim applied a net operating loss deduction of $5,429,186 for the capitalized bankruptcy costs as a "specified liability loss" for the taxable year ending January 26, 1997, carried back to the taxable year ending January 25, 1987, pursuant to 26 U.S.C. § 172(f). The claim sought a refund of $2,497,426 for that taxable year. After reviewing Standard Brands' claim, the Internal Revenue Service ("IRS") issued a technical advice memorandum ("TAM") on June 17, 1999, denying a loss deduction.[2] In a September 1, 1999, letter, the IRS proposed disallowance of the claim. On April 5, 2000, Standard Brands and the Liquidating Trust filed this complaint seeking refund of taxes plus interest.

## DISCUSSION

■ Section 172 allows a deduction for the aggregate of net operating loss carrybacks and carryovers to the taxable year. § 172(a) (unless indicated, all subsequent references are to the I.R.C.). "Net operating loss" is defined as the excess of deductions allowed over gross income. § 172(c). Generally, a net operating loss can be carried back for up to three years and carried forward for up to fifteen years. § 172(b)(1)(A). A special category of net operating losses called "specified liability losses," however, can be carried back 10 years. § 172(b)(1)(C).

There is no question that Standard Brands' capitalized bankruptcy costs are deductible and subject to a carryback of up to three years. The issue is whether they qualify for the ten year carryback created by section 172(b)(1)(C).

For the relevant period of time,[3] Section 172(f) defined "specified liability losses," insofar as relevant here, as follows:

(1) In general.—The term "specified liability loss" means the sum of the following amounts to the extent taken into account in computing the net operating loss for the taxable year:

. . . .

(B) Any amount (not described in subparagraph (A)) allowable as a deduction under this chapter with respect to a liability which arises under a Federal or State law or out of any tort of the taxpayer if—

(i) in the case of a liability arising out of a Federal of State law, the act (or failure to act) giving rise to such liability occurs at least 3 years before the beginning of the taxable year, or

. . . .

---

1. Standard Brands has substantiated $5,346,478.11 of the $5,429,186 capitalized bankruptcy costs. The parties continue to dispute the substantiation of the remaining $82,707 of the capitalized bankruptcy costs.

2. ° In the TAM, the IRS explored the legislative history of the 1984 tax law changes that created the ten year rollback provision in Section 172. The TAM asserted that this legislative history shows that the phrase "deduction ... with respect to a liability" was tantamount to a deduction *for* a liability. This distinction provides support for the central claim of the TAM: the deduction was not for a liability, but for "the worthlessness of an asset." In other words, the

capitalized bankruptcy costs were a loss, not a liability. Defendant does not rely on the analysis in the TAM. TAMs have no precedential weight, and the government is certainly not bound to follow the reasoning used in the particular TAM that arose from this dispute.

3. In 1998, Congress amended I.R.C. § 172(f)(1)(B) to narrow its reach. This provision now includes only liabilities attributable to the reclamation of land, the decommissioning of a nuclear power plant, the dismantling of a drilling platform, the remediation of environmental contamination, or a payment under any workmen's compensation act.

A liability shall not be taken into account under subparagraph (B) unless the taxpayer used an accrual method of accounting throughout the period or periods during which the acts or failures to act giving rise to such liability occurred.

26 U.S.C. § 172(f). There must be an act, in short, which gives rise to liability under state or federal law and that act must have occurred more than three years prior to the tax year in question.

The government concedes that most elements of section 172(f) are met. It contends, however, that these costs are not attributable to a liability which arose under federal or state law. Alternatively, it argues that, if there was such an act, it had not occurred by January 26, 1993, 3 years before the beginning of the taxable year.

With respect to the first issue, whether these costs are attributable to a liability which arises out of federal or state law, plaintiffs argue that the law giving rise to the deduction in this case is, in general, Title 11 of the bankruptcy code. More specifically, it is those provisions requiring the appointment of a creditors' committee and allowing that committee to incur expense for professional services, 11 U.S.C. §§ 1102, 1103. Those deductible expenses capitalized during the first bankruptcy, according to plaintiffs, are directly traceable to these code provisions.

With respect to the second issue, when the act occurred, plaintiffs' preferred event is the filing of the first bankruptcy. At that point, according to plaintiffs, the entire weight of the bankruptcy laws came to bear on the Standard Brands estate, making it subject to the all the requirements of the code, including bearing costs associated with professionals hired by the creditors committee.

The government contends that the connection between the capitalized expenses and the bankruptcy code is insufficient; that there are too many uncertainties intervening between the filing of the bankruptcy petition and the final order of the bankruptcy court ordering the estate to pay the fees. With respect to the timing question, the government contends that the relevant "act" is the order confirming fees; that everything up to that point is simply too contingent to sustain the necessary connection.

■ Consideration of section 172(f) is novel in this circuit, and its application in this case raises difficult questions. Nevertheless, for the reasons set out below, we believe that the government's position is correct. The connection between the deduction claimed and the bankruptcy code is simply too attenuated to sustain the deduction.

This is ultimately a matter of statutory construction. Unfortunately the agency did not issue interpretive regulations and, indeed, still has not adopted regulations construing the current law. Both parties consequently draw heavily on the only three cases dealing with the previous law. Two arose from the Tax Court. One arose in federal district court. *Sealy Corp. v. Comm'r of Internal Revenue*, 171 F.3d 655 (9th Cir. 1999) (affirming *Sealy Corp. v. Comm'r of Internal Revenue*, 107 T.C. 177, 1996 WL 599766 (1996)); *Host Marriott Corp. v. United States*, 113 F.Supp.2d 790 (D.Md.2000); *Internet Corp. v. Comm'r of Internal Revenue*, 117 T.C. 133, 2001 WL 1164198 (2001).

*Sealy* involved a claim that fees and expenses paid for accounting and legal services in connection with compliance with the Securities and Exchange Act could be carried back for ten years under section 172(f). The corporate plaintiffs relied on the fact that the Act required them to file quarterly and annual financial reports with the SEC. *See* 15 U.S.C. § 78(m). In addition, they claimed expenses incurred in connection with auditing and examination of the companies' employee retirement plans, pursuant to 29 U.S.C. § 1023(a)(1). The Tax Court rejected the argument:

> [T]hose provisions do not establish petitioners' liability to pay the amounts at issue. Petitioners' liability to pay those amounts did not arise until petitioners contracted for and received the services. Petitioners' choice of the means of compliance, and not the regulatory provisions, determined the nature and amount of their costs.

107 T.C. at 184, 1996 WL 599766.

The Tax Court went on to supplement its analysis, drawing on the doctrine of *ejusdem*

*generis* and an examination of the legislative history to conclude that section 172(f) was meant to apply to a "relatively narrow class of liabilities." *Id.* at 186, 1996 WL 599766. The Ninth Circuit affirmed, although not on the latter grounds. Instead it began with the observation that the phrase "arising out of a Federal or State law" had to mean something more than simply, "with respect to." 171 F.3d at 657. It agreed with the principal ground of the Tax Court decision:

> The act giving rise to each of the liabilities in question was the contractual act by which Sealy engaged lawyers or accountants....
>
> Sealy's argument essentially is that the act giving rise to the liability is the first event in a chain of causes which gives rise to the liability. The argument leads to a *reductio ad absurdum.* The organization of the company gave rise to an obligation to comply with all pertinent state and federal laws and thereby gave rise to the liabilities incurred in complying with these laws. According to this logic, every corporation would have a specified liability carryback for all costs the corporation incurred to comply with relevant laws. Congress did not create such a windfall.

*Id.* at 657–58.

*Host Marriott* involved two different types of deductions. One was for payments of workmen's compensation claims. The other was for federal income tax deficiency interest. The district court sustained the deductions, holding that the liabilities were mandated by federal law, in the case of deficiency interest, §§ 6601(a), 6621, and state law, in the case of workmen's compensation liability.

> The district court differentiated *Sealy:*
>
> Unlike in *Sealy,* the deductions in this case qualify as specified liability losses because Plaintiff's liability for workers compensation claims and tax deficiency interest, and the amounts at issue, are set by federal or state law, and not by Plaintiff's choice.

113 F.Supp.2d at 794.

The Tax Court revisited the issue in 2001 in *Intermet,* a case that, like *Host Marriott,* involved a claim that federal income tax deficiency interest constituted a "specified lia-

bility loss" under section 172(f). Like the district court, the Tax Court in *Intermet* distinguished expenses for accounting and legal professionals found ineligible in *Sealy* from federal income tax deficiency interest. 117 T.C. at 138–39, 2001 WL 1164198. With respect to the former, the plaintiff's choice, not the regulatory provisions, determined the nature and amount of the liability. *Id.* at 138, 2001 WL 1164198. The latter, by contrast, were "expressly impose[d]" by federal law. *Id.* at 140, 2001 WL 1164198.

Two principles can be derived from these three cases. The first is that "arising out of a state or federal law" means more than just that the liability was incurred "with respect to" a law. The test is not one of free association, in other words. The second principle is that liabilities "arising out of" law must be traceable to a specific law and cannot be the result of choices made by the taxpayer or others. We adopt these principles.

These holdings are only guidance in the particular facts here, however. The holdings are not directly on point. Nevertheless, we find that the predominant similarities of the present facts are to *Sealy,* whereas the predominant distinctions lie between those facts and *Host Marriott* and *Intermet.*

There is no question, as plaintiffs point out, that several provisions of the bankruptcy code imposed requirements on the bankrupt estate. For example, a committee had to be appointed; that committee could hire professionals; and those professionals had to be paid out of the estate. 11 U.S.C. §§ 327, 328, 330, 331, 1102, 1103. The code also required the bankruptcy court to review applications to retain those professionals, to authorize their hiring, and to approve the terms of and administer payment. *Id.* Standard Brands also cites local Rule 2.9.1 of the bankruptcy court, which required Standard Brands to retain counsel.

The professional services in *Sealy,* similarly, could be traced to the need to comply with statutory auditing and reporting requirements, not unlike the requirement in a Chapter 11 bankruptcy to appoint a creditors' committee. Like *Sealy,* the committee had to make choices about who to engage as professionals and how much to pay them.

Unlike *Sealy,* however, in this instance, those expenses had to be approved by a court. As defendant correctly suggests, this adds another level of uncertainty, at least until the court's order of approval. The court has the right to disapprove as well as approve.

The filing of a bankruptcy petition in this case, according to plaintiffs, is analogous to the filing of the tax return in *Intermet.* Both events triggered the applicability of certain statutory provisions, which, in turn, lead to an obligation to pay money. Unlike *Intermet,* however, the events fixing liability had not fully taken place. Nor were amounts calculable until services were incurred and fees approved.

The same comparisons can be made to *Host Marriott* and *Intermet.* There is a superficial similarity, in that the filing of the bankruptcy petition, like the filing of a tax return or an accident underlying workmen's compensation liability, "triggered" the applicability of a federal statutory scheme. Unlike the present case, however, the events upon which liability would be determined were fixed in those cases upon the occurrence of the event.

Income tax deficiency interest is an obligation arising directly from sections 6601 and 6621. Although the facts still have to be determined at the time of filing the return, once they are determined, then, assuming there is liability for tax, the liability to pay interest is fixed, *nunc pro tunc,* back to the time of filing. The post-filing intervening events do not alter the facts as of the date of filing, as subsequently determined. Section 6601 then establishes that interest will be assessed to a deficient taxpayer in a particular amount set by section 6621. These two statutes work in tandem to establish a specific type of liability and expressly impose it upon certain parties. They also establish a clear and exact means of calculating the amount of the liability.

Similarly, the act triggering liability in the case of workmen's compensation claim occurs once in time. Although at that moment there is uncertainty as to whether a claim will be filed and whether payment will be made, the determination that the worker is entitled to payment is based on the facts surrounding the accident. Much like a tort action, there is a single event in the past that creates the possibility of liability. Subsequent events do not alter the implications of the initial event. From the corporation's perspective, it is an ongoing liability from the day of the accident.

On balance, we conclude that the connection between these capitalized expenses and the bankruptcy code is too attenuated to meet the requirements of section 172(f)(1)(B). Like *Sealy,* the events fixing liability still lay ahead at the time of the initial bankruptcy filing. The only certainty lay in the powers granted to the court and to the creditors' committee. Liability at that point was still uncertain in every other respect and dependent upon the discretion of the committee and the court. To the extent plaintiffs rely in the alternative on the date of the appointment of the creditors' committee, February 27, 1992, we find that no additional certainty accrued at that point. What the committee would do and what the court would do were still unclear. The finality engendered by the orders of the bankruptcy court approving payment of the fees does not help plaintiffs here. If those orders constitute the "act" triggering liability, they are too recent in time to meet the three year requirement. *See* § 172(f)(1)(B)(ii).

Ruling for the plaintiffs here would require giving the law an expansive reading—akin to the "in connection with" construction rejected elsewhere—that is inconsistent with the principle that deductions are considered matters of legislative grace and thus narrowly construed. *See Host Marriott,* 113 F.Supp.2d at 792.

## CONCLUSION

For the reasons stated above, the plaintiffs' motion for summary judgment is denied and the government's cross-motion for summary judgment is granted. Judgment accordingly. No costs.