In re HARVARD INDUSTRIES,
INC., et al., Debtors.

No. 02–50586.

United States Bankruptcy Court,
D. New Jersey.

Oct. 20, 2006.

James N. Lawlor, Esquire, Wollmuth, Maher & Deutsch, LLP, Newark, NJ, Attorney for Harvard Secured Creditors Liquidation Trust.

Lawrence P. Blaskopf, Esquire, U.S. Department of Justice, Washington, D.C., Attorney for United States.

## OPINION

KATHRYN C. FERGUSON,
Bankruptcy Judge.

### Procedural History

The Debtors Harvard Industries, et al. ("Harvard") filed a motion styled "Notice of Motion Requesting a Determination as to Harvard's Right to a Tax Refund Pursuant to 11 U.S.C. § 505" ("Tax Refund Motion") on June 24, 2003. In September of that year, the Debtors amended the Tax Refund Motion to clarify certain statements made in the original motion. Prior to the resolution of the Tax Refund Motion, Harvard confirmed its Chapter 11 plan. Pursuant to the Plan, certain assets and causes of action were assigned to various trusts that were to be established under the Plan. As a result, the Harvard Secured Creditors Liquidation Trust ("Trust") became the party in interest in this matter.

The court determined that the Tax Refund Motion should proceed as a contested matter under Fed. R. Bankr.Pro. 9014. On February 22, 2005, the court took oral argument on motions for summary judgment brought by the Internal Revenue Service ("IRS") and the Trust. At the conclusion of oral argument, the court denied summary judgment on the issue of deduction for workers' compensation expenses pending additional discovery by the parties. The remaining issues were addressed in an opinion dated February 28, 2005, and incorporated into an order dated March 24, 2005 ("summary judgment order"). The IRS appealed the summary judgment order to the District Court, which disallowed the partial refund this court had ordered and remanded the proceeding to this court.

Discovery on the workers' compensation issue concluded on June 23, 2006, and this court took evidence on July 6, 2006. After presenting closing statements, the parties requested an opportunity to submit post-trial briefs. The final post-trial brief was filed on August 11, 2006.

### Discussion

The Trust seeks to carry back $2,076,066.55 in workers' compensation and products liability related expenses[1] to the 1985 tax year, a year in which the Debtor and its subsidiaries had more than $6 million in net income.[2] The IRS contends that Harvard is not entitled to its claimed deductions because: 1) Harvard did not pay the claimed expenses in the 1995 tax year; 2) Harvard cannot carry back amounts it paid Wausau to administer the insurance claims; and 3) the IRS already allowed an excessive refund because it did not allocate part of the losses carried back to Doehler–Jarvis.

At the evidentiary hearing, the Trust presented the testimony of David A. White. Mr. White had been associated with Harvard in various capacities since 1995. His positions with Harvard have included president, chief financial officer, secretary, assistant general counsel, and general counsel. In addition, Mr. White serves as a consultant to the Trust. Mr. White was responsible for risk management issues, including workers' compensation and other insurance issues, for Harvard and some of its subsidiaries. The IRS cross-examined Mr. White, but did not present any witnesses.

### A. *Timing and nature of the premium payments*

From 1988 to 1992, Harvard and its subsidiaries had workers' compensation and general liability policies with Wausau Insurance Company. Mr. White testified that the Wausau policies were "retrospective insurance plans." *Tr. 7/6/06* at 19. Under such plans, yearly premiums are based on the insured's actual loss experienced during the policy term. Harvard was required to pay an initial premium at the beginning of the policy year, which functioned as both a standard insurance payment and as a prepayment designed to cover anticipated claims under the policies. *Tr. 7/6/06* at 19–21. Harvard was sometimes required to pay additional premiums based on the number of claims Wausau paid during the policy year. Wausau routinely made these retrospective adjustments approximately six months after the end of policy years. Mr. White testified that Harvard's records indicated that the retrospective adjustments relevant to the refund request at issue were sent to Harvard around October 1995. Wausau and Harvard then commenced negotiations and ultimately came to an agreement as to the appropriate adjustments in early 1996. *Tr. 7/6/06* at 59–62.

The Trust argues that the IRS improperly characterizes Harvard's insurance premium payments as the equivalent of an escrow or annuity, and attributes payments not to the date when Harvard ultimately paid the billed premiums, but to a date when the insurer paid the underlying claim. The IRS contends that apart from some expenses incurred through self-in-

---

1. The expenses at issue in this matter were paid by the Debtors during the Debtors' fiscal tax year beginning October 1, 1995, and ending on September 30, 1996. ("1995 tax year")

2. Form 1120 U.S. Corporation Income Tax Return for fiscal year ending September 30, 1986 ("1986 tax year") shows taxable income of $6,475,231. [Ex. T–7] As of January 14, 2002, Harvard still had taxable income of $4,000,247 attributable to the 1986 tax year. [Ex. T–15]

suring its Trim Trends subsidiary and a payment of $651.45, there is no evidence that Harvard made any payment in its 1995 tax year to Wausau on account of workers' compensation.

■ The taxpayer has the burden of proving that it is entitled to a refund. *United States v. General Dynamics Corp.*, 481 U.S. 239, 107 S.Ct. 1732, 95 L.Ed.2d 226 (1987). The proper timing for a deduction is generally determined based on the method of accounting used by the taxpayer. 26 U.S.C. § 461(a). Harvard used the accrual method of accounting and is thus not considered to incur an expense "any earlier than when economic performance with respect to such item occurs." 26 U.S.C. § 461(h)(1). The Internal Revenue Code defines "economic performance" based on the nature of the payment. For workers' compensation payments, "[i]f the liability of the taxpayer requires a payment to another person and-arises under any workers compensation act ... economic performance occurs as the payments to such person are made." 26 U.S.C. § 461(h)(2)©. The accompanying regulations further elucidate that definition and provide examples. The examples accompanying 26 C.F.R. § 1.461–4(g)(5) make clear that for workers' compensation liabilities covered by insurance, economic performance occurs when the insurance premium is paid. 26 C.F.R. § 1.461(g)(8)(examples 5–7).

■ Application of those principles to these facts is not as clear as the Court would hope. As the IRS correctly points out, Harvard paid Wausau insurance premiums at the inception of each policy year and the policy years ran from April 1988 through April 1992. Accordingly, the IRS argues that Harvard cannot claim a deduction for its 1995 tax year. The IRS maintains that as Wausau received premiums from Harvard, it used them to "establish reserves for each of Harvard's subsidiaries", and it used these "reserves" to cover the worker's compensation claims it paid to Harvard's employees. *United States' Post–Trial Brief* at 9. The court disagrees with the IRS's interpretation of the facts of record, which do not clarify how Wausau treated the premiums Harvard paid. The IRS did not present testimony to support its "reserve" theory; instead, it relied on the records Wausau sent to Harvard in the Fall of 1995 [Ex. T–2; T–1953, T–2031] to show that Wausau applied previously paid premiums to pay claims that arose between October 15, 1994 and October 15, 1995. Those records are ambiguous as they could merely reflect the historical course of conduct between the parties rather than the establishment of a reserve. Mr. White testified that the books reflect that Wausau did not issue refunds and then require Harvard to pay new premiums, rather the amounts were offset and only an excess payment or refund actually issued. Mr. White testified that was the course of conduct established between Harvard and Wausau. The IRS's only attempt to refute Mr. White's testimony was to argue that it was "telling" that Harvard did not consider any such "refunds" as income to be reported on its tax returns. Mr. White acknowledged that he did not know whether Harvard reported any of the "hypothetical refunds" from Wausau as income on its 1995 tax return *Tr.* at 104. But even if the IRS had definitively established that Harvard did not report theses hypothetical refunds there are other possible ways the "refunds" could have been reported for tax purposes. Overall, the court finds Mr. White's testimony about the previous practices between Harvard and Wausau not only convincing, but also consistent with standard practices in the insurance industry. It would be a significant departure to

interpret an insurance policy as the equivalent of an escrow agreement. The evidence presented does not warrant such a departure.

The Trust's argument is also consistent with the regulations regarding economic performance. As previously noted, for an accrual based taxpayer such as Harvard, a liability is only incurred "in the taxable year in which all the events have occurred that establish the fact of the liability, the amount of the liability can be determined with reasonable accuracy, and economic performance has occurred with respect to the liability." 26 C.F.R. § 1.461–1(a)(2) For Harvard, the earliest those requirements could have been met was October 1995 when Wausau sent Harvard the retrospective plan adjustments. Therefore, the court will overrule the IRS's objection to the refund claim on the ground that Harvard did not pay the workers' compensation expenses in its 1995 tax year.

B. *Nature of payments to Wausau*

■ Wausau charged Harvard a premium expense for the administration of the plan. *Tr. 7/6/06* at 19–20. Wausau would apply a loss conversion factor to the paid losses and bill Harvard to cover claims adjusting expenses and the insurer's claim service. According to the testimony of Mr. White, the loss conversion factor was a charge included by all insurance companies in retrospective policies and was nonnegotiable. *Tr.* at 20–21. Mr. White further testified that the application of a tax multiplier was standard in retrospective policies. The tax multiplier, sometimes called a tax factor, was applied to cover state premium taxes.

The IRS does not object to a deduction for the tax multiplier charges on the theo-

ry that those charges arise out of state tax law and thus may be carried back ten years under 26 U.S.C. § 172(b)(1)(C). The IRS only takes issue with the costs Wausau charged to administer the insurance policies. The relevant statute [3] at the time provided that the term "specified liability loss" meant:

Any amount (not described in subparagraph (A)) allowable as a deduction under this chapter with respect to a liability which arises under a Federal or State law or out of any tort of the taxpayer if—

(I) in the case of a liability arising out of a Federal or State law, the act (or failure to act) giving rise to such liability occurs at least 3 years before the beginning of the taxable year, or

(ii) in the case of a liability arising out of a tort, such liability arises out of a series of actions (or failures to act) over an extended period of time a substantial portion of which occurs at least 3 years before the beginning of the taxable year.

A liability shall not be taken into account under subparagraph (B) unless the taxpayer used an accrual method of accounting throughout the period or periods during which the acts or failures to act giving rise to such liability occurred.

26 U.S.C. § 172(f)(1)(B).

Neither party has directed the court to a case directly on point, nor has court's own research uncovered any. Rather, the IRS relies on *Sealy Corp. v. Commissioner,* 107 T.C. 177, 1996 WL 599766 (1996), *aff'd,* 171 F.3d 655 (9th Cir.1999) and the Trust relies on *Host Marriott Corp. v. United States,* 113 F.Supp.2d 790 (D.Md.2000), *aff'd,* 267 F.3d 363 (4th Cir.2001). In *Sea-*

---

**3.** This section was amended as part of the Tax and Trade Relief Extension Act of 1998. The amendment is not applicable to this case be- cause it was only effective for net operating loses arising in taxable years ending after October 21, 1998.

*ly* the taxpayer sought a carryback under § 172(f)(1)(B) for amounts it paid to an independent public auditor in connection with filing annual reports with the SEC. The Tax Court rejected the taxpayer's argument that the expenses arose under federal law despite the fact that a federal statute required the taxpayer to file such reports and required that the reports be audited by an independent public auditor. The Tax Court reasoned that:

> It is true that the 1934 Act, ERISA, and the Internal Revenue Code require petitioners to file financial reports and disclosure statements, maintain and provide books and records, and cooperate with IRS audits. However, those provisions do not establish petitioners' liability to pay the amounts at issue. Petitioners' liability to pay those amounts did not arise until petitioners contracted for and received the services. Petitioners' choice of the means of compliance, and not the regulatory provisions, determined the nature and amount of their costs. If, on the other hand, petitioners had failed to comply with the auditing and reporting requirements or had not obtained the particular services in issue here, their liability would have been in amounts not measured by the value of services. Thus, petitioners' liability did not arise under Federal law.

*Sealy,* 107 T.C. 177, 184, 1996 WL 599766 (1996) In this case, the IRS analogizes that while state law may have required Harvard to have workers' compensation insurance, state law did not dictate the means of compliance. Harvard was thus free to chose any insurance company and the ultimate charges were set by Harvard and Wausau rather than by state law.

The Trust relies on a statement by the District Court in *Host Marriott* that distinguished the *Sealy* decision by stating that "plaintiff's liability for workers' compensation claims ... are set by federal or state law, not by plaintiff's choice." *Host Marriott,* 113 F.Supp.2d at 794. As a result, the District Court found that the workers' compensation expenses qualified as specified liability losses. The Fourth Circuit did not address the workers' compensation issue on appeal. Unfortunately, the *Host Marriott* case is of limited assistance to this Court because the *Host Marriott* court did not focus on the administrative expense aspect of workers' compensation claims. In fact, it is impossible for this Court to ascertain if there was an administrative expense component in the workers' compensation claims at issue in that case.

There are two additional cases that shed some light on this issue. The first is *Intermet Corporation v. Commissioner of Internal Revenue,* 117 T.C. 133, 2001 WL 1164198 (2001). In that case, the Tax Court held that liabilities arising from federal and state income tax deficiencies arose under federal and state law and thus constituted specified liability losses. The court's reasoning largely tracked that of *Host Marriott,* and noted that "State and Federal law expressly impose the liabilities for tax and interest at issue in this case." *Id.* at 140. In *Standard Brands Liquidating Creditor Trust v. United States,* 53 Fed.Cl. 25 (2002), *af'd sub nom., Major Paint Company v. United States,* 334 F.3d 1042 (Fed.Cir.2003), a Chapter 11 debtor/taxpayer sought a deduction for the expenses for professionals hired by the creditors committee. The taxpayer argued that the expenses arose under the federal bankruptcy statutes, because the Bankruptcy Code contains provisions that allow for the hiring of professionals by an official creditors committee and approval of those fees by the bankruptcy court. The United States Court of Federal Claims found this was a matter of statutory construction, but noted that the IRS had not issued any

interpretive regulations and that the extant cases construing the issue-including *Sealy* and *Host Marriott*-were limited. The court reasoned that two principles could be derived from the interpretive caselaw:

> The first is that "arising out of a state or federal law" means more than just that the liability was incurred "with respect to" a law. The test is not one of free association, in other words. The second principle is that liabilities "arising out of" law must be traceable to a specific law and cannot be the result of choices made by the taxpayer or others.

*Standard Brands* at 29. Applying those principles, the court found that the bankruptcy expenses did not qualify as specified liability losses. Guiding that court's decision was the fact that the Creditors Committee had to make choices about whom to engage as professionals and how much to pay them. The court also found that giving the statute the expansive reading the taxpayer urged was inconsistent with the oft cited principle that deductions are considered matters of legislative grace and thus narrowly construed. *Id.* at 30. In affirming the lower court, the Court of Appeals for the Federal Circuit held that "the costs at issue merely arose with respect to an obligation under the Bankruptcy Code, a connection we hold to be too attenuated to met the level of 'arise under' necessary to qualify as a specified liability loss." *Major Paint* at 1047.

The rationale of those cases compels the conclusion that the administrative expenses charged by Wausau here were too attenuated to satisfy the "arising under" standard of 26 U.S.C. § 172(f)(1)(B). While the expenses are certainly related to the state law requirement that Harvard maintain workers' compensation insurance, Harvard had considerable discretion as to how to meet that requirement. Mr. White testified that the charges were not optional and were charged by every insurer issuing retrospective insurance policies. It was Harvard, however, who chose to comply with the law requiring workers' compensation insurance by entering into a contract with Wausau for a retrospective insurance policy. The court was not pointed to any state law that required a retrospective policy. Presumably other insurers and other types of insurance policies were available, but Harvard chose both Wausau and a retrospective policy. As in *Sealy*, Harvard's choice of how to comply with the law resulted in the specific charges at issue here, not the general dictates of state law.

As a final argument, the Trust analogizes the administrative expenses that it paid to Wausau to the expenses incurred in the investigation, settlement, or opposition to product liability losses. Such expenses are allowed deductions pursuant to 26 U.S.C. § 172(f)(1)(A)(ii). That argument actually pulls in the opposite direction. It is clear that Congress knew how to include expenses for investigation and settlement; it chose to do so for product liability expenses. Since Congress did not utilize the same language for workers' compensation expenses, the court must presume that the difference was intentional.

■ The burden of clearly showing the right to the claimed deduction is on the party claiming the deduction. *INDOPCO, Inc. v. Commissioner of Internal Revenue,* 503 U.S. 79, 84, 112 S.Ct. 1039, 117 L.Ed.2d 226 (1992). On this record, the court cannot find that the Trust has met its burden. The court will uphold the IRS's objection to the administrative expenses claimed as deductions.

C. *Effect of Doehler–Jarvis not being a member of Harvard's tax group in the 1985 tax year*

■ Harvard and several of its subsidiaries filed consolidated tax returns in both

the 1985 and 1995 tax years. Doehler–Jarvis, Inc., one of the members of the 1995 Harvard consolidated group, was not a member of the 1985 Harvard group. As a member of the 1995 Harvard group, Doehler–Jarvis contributed 32.4% of the losses.

The IRS argues that if Harvard is entitled to have additional losses carried back, those losses should be offset by excessive amounts the IRS allowed Harvard to carry back on account of Doehler–Jarvis. The IRS maintains that under the loss allocation provisions of the consolidated return regulations, 26 C.F.R. § § 1.1502–21A and 1.1502–79A, $801,895 of the amount the IRS allowed Harvard to carry back 10 years should have been allocated to Doehler–Jarvis and not the 1985 Harvard group. The Trust contends that the Secretary's promulgation of the regulations under § § 1.1502–21 A and 1.1502–79A appears to have been arbitrary, capricious and contrary to 26 U.S.C. § 172(b) and (f).

■ With regard to consolidated tax returns, the statute provides that the "Secretary shall prescribe such regulations as he may deem necessary.…" 26 U.S.C. § 1502. Although the Secretary's authority to promulgate regulations is not unfettered, where, as here, Congress has explicitly given an agency authority to enact regulations, those regulations are given "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

The Trust argues that in enacting the regulations, the Secretary limited the use of the portion of the consolidated net operating loss attributable to a member of the consolidated group that had previously filed separate returns. As a result, the Trust maintains that "the regulations serve to eliminate any or all of an otherwise valid specified liability loss deduction on a consolidated basis for reasons having nothing to do with the inclusion of a new member in the consolidated group." *Trust Post–Trial Brief* at 22. On its face that is a very compelling argument because the result of these regulations is that taxpayers in a consolidated group may be forced to lose an otherwise valid specified liability loss deduction that Congress granted them by virtue of section 172. A result that would be "manifestly contrary to the statute" and thus run afoul of *Chevron.*

■ The chink in that argument is found in the 2004 amendments to 26 U.S.C. § 1502. In that amendment Congress added the following sentence to the end of the statute: "In carrying out the preceding sentence, the Secretary may prescribe rules that are different from the provisions of chapter 1 that would apply if such corporations filed separate returns." Although that amendment came after the tax years at issue here, it applies retroactively (2004 Acts. Pub.L. 108–357, Title VIII, § 844©, Oct. 22, 2004, 118 Stat. 1600, provided that: "This section, and the amendment made by this section [amending this section], shall apply to taxable years beginning before, on, or after the date of the enactment of this Act [Oct. 22, 2004]."). As a result, the argument that the consolidated Harvard group is losing a deduction they might be entitled to if they filed separately is unavailing. As one court noted: "The election to file a consolidated return for an affiliated group inherently carries with it both advantages and disadvantages as compared to filing separate returns." *Garvey, Inc. v. United States,* 1 Cl.Ct. 108 (1983), *aff'd,* 726 F.2d 1569 (Fed.Cir.1984). As the court stated in *Georgia–Pacific Corp. v. Commissioner,* 63 T.C. 790, 1975 WL 3003 (1975), the affiliated group that voluntarily elects to

file a consolidated return "must now take the bitter with the sweet." *Id.* at 802.

Accordingly, the court upholds the IRS's claim that any carry back losses should be offset by excessive amounts the IRS allowed Harvard to carry back on account of Doehler–Jarvis.

### Conclusion

For the reasons stated above, the court holds that the retrospective adjustments may be classified as a loss in the 1995 tax year; that the administrative expenses charged by Wausau are not properly classifiable as expenses arising under federal law; and that any carry back losses should be offset by excessive amounts the IRS allowed Harvard to carry back on account of Doehler–Jarvis. Counsel for the IRS shall submit an order consistent with this opinion.