## Woods Investment Company, Petitioner v. Commissioner of Internal Revenue, Respondent

Docket No. 6237–83.     Filed August 15, 1985.

*Alan Newman, Richard C. Stark, Lawrence B. Gibbs, Len Cason*, and *James C. Prince*, for the petitioner.

*Thomas J. Miller, John Broadbent*, and *Virginia Vorhees*, for the respondent.

### OPINION

Fay, *Judge*: Respondent determined a deficiency of $3,211,019 in petitioner's 1978 Federal income tax. The only issue is whether petitioner properly computed the basis in its subsidiaries' stock in reporting gain from the sale of the stock.

The facts have been fully stipulated and are so found.

Petitioner Woods Investment ·Co., a Delaware corporation, had its principal office in Oklahoma City, Oklahoma, at the time it filed the petition herein.

Petitioner is a calendar year taxpayer using the accrual method of accounting. From the date of its formation in 1966 through its taxable year ended December 31, 1978, petitioner was the common parent of an affiliated group of corporations (hereinafter referred to as the group) as defined in section 1504.[1] The group properly filed consolidated Federal income

---

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect during the year in issue.

tax returns pursuant to section 1501 for each such taxable year.[2]

Upon its formation in 1966, petitioner acquired all of the stock of Woods Industries, Inc., a Delaware corporation (WII). WII was a holding company which, in December 1960, acquired all of the stock of United Transports, Inc. (UTI) and Auto Warehousers, Inc. (AWI). UTI and AWI remained wholly owned subsidiaries of WII until 1971 when WII was liquidated. Upon such liquidation, WII distributed all of its assets, including all of its UTI and AWI stock, to petitioner.

UTI and AWI operated petitioner's transportation division which transported new motor vehicles for major domestic manufacturers of cars and trucks between various points in the midwestern and southwestern United States. In addition, it delivered foreign motor vehicles from their port of entry at Houston, Texas, to dealers in 13 states. In 1978, all trucking services were conducted by UTI, which owned all truck tractors and trailers. All rail and other terminals and other real estate used by the transportation division were owned by AWI. On December 12, 1978, the principal assets of UTI were a fleet of approximately 760 diesel-powered over-the-road tractors and trailers, and the principal assets of AWI were the real property utilized by the transportation division.[3] Petitioner owned all of the stock of UTI and AWI until December 12, 1978.

In December 1966, petitioner had also acquired all of the stock of Star Manufacturing Co. of Oklahoma (SMC). SMC was primarily engaged in the business of manufacturing and marketing a broad line of pre-engineered metal building systems for a variety of commercial, industrial, and agricultural uses. Each system was composed of standardized building components, consisting generally of primary structural members and various panels used as roofing and wall coverings. SMC's products are used as manufacturing facilities, shopping centers, office buildings, warehouses, and retail stores. SMC's principal manufacturing facility was a plant located in Oklahoma City, and it had two other plants located in Cedartown, Georgia, and Homer City, Pennsylvania. Major production

---

[2]From Jan. 1, 1979, through the present, petitioner has not been a member of an affiliated group.

[3]During the relevant periods herein, AWI, from time to time, owned all of the stock of certain subsidiaries engaged in various active businesses including selling auto crushing equipment and certain other machinery utilized in the salvaging of junk automobiles.

equipment at all plants consisted of punch presses, roll farming equipment, and automatic welding machines.[4] SMC was a wholly owned subsidiary of petitioner from 1966 through December 12, 1978.

In 1971, SMC organized Star Realty Management, Inc. (SRM), as its wholly owned subsidiary. SRM was formed to own interests in, and manage, two partnerships that developed, owned, and managed commercial real estate projects. It also conducted a real estate brokerage business through a wholly owned subsidiary. In 1975, all of the SRM stock was distributed to petitioner as a dividend.[5] SRM thus became a wholly owned subsidiary of petitioner, which it remained until December 12, 1978.

UTI, AWI, SMC, and SRM were wholly owned subsidiaries of petitioner until December 12, 1978, and will be referred to herein as "the subsidiaries." The subsidiaries used accelerated methods to depreciate their business property when permitted.[6]

On December 12, 1978, petitioner's shareholders approved the sale of all of the subsidiaries' stock and certain other assets owned by petitioner to WDS, INC., (WDS), a Delaware corporation, in exchange for cash and the assumption of all petitioner's liabilities (herein the sale). Thus, as part of the sale, WDS agreed to assume all Federal and State income taxes payable to petitioner, including those arising as a result of any gain

---

[4]During the relevant period herein, SMC conducted portions of its business through wholly owned subsidiaries.

[5]This distribution was made in accordance with sec. 1.1502–14(a)(1), Income Tax Regs.

[6]From 1966 through the taxable year ended Dec. 12, 1978, the subsidiaries had taxable income (loss) as follows:

| Taxable year | UTI | AWI | SMC | SRM |
|---|---|---|---|---|
| 1966 | $663,994 | $520,186 | - - - | - - - |
| 1967 | 963,661 | 588,260 | $1,186,200 | - - - |
| 1968 | 1,839,759 | 821,357 | 1,967,487 | - - - |
| 1969 | 1,115,278 | 811,252 | 3,104,707 | - - - |
| 1970 | 509,907 | 163,191 | 810,390 | $11,355 |
| 1971 | 1,300,564 | 1,925,978 | 1,114,695 | (39,567) |
| 1972 | 1,971,132 | 1,858,952 | 3,215,379 | (49,705) |
| 1973 | 1,316,315 | 3,577,206 | 2,875,656 | (172,163) |
| 1974 | (1,017,145) | 3,294,055 | (282,318) | (150,212) |
| 1975 | 237,212 | 2,592,679 | (376,881) | (212,985) |
| 1976 | 1,668,047 | 1,858,578 | 1,679,297 | (150,262) |
| 1977 | 1,818,283 | 658,683 | 2,511,228 | (3,205) |
| TYE 12/12/78 | 1,190,963 | 1,181,748 | 2,672,181 | 53,008 |

recognized from the sale. In determining the total purchase price that it would pay for the assets, WDS needed to ascertain the amount of petitioner's anticipated gain on the sale and resulting Federal income tax liability. Accordingly, petitioner and WDS sought, with the assistance of petitioner's public accounting firm, to calculate petitioner's basis in the stock of the subsidiaries. Such basis was determined to be $24,648,868, and the sale was consummated on December 13, 1978.

On its 1978 return, petitioner reported a long-term capital gain of $1,472,378 on the sale.[7] In his notice of deficiency, respondent determined that petitioner's basis of $24,648,868 in the subsidiaries' stock must be decreased by $7,373,131 and therefore respondent determined that petitioner realized a gain of $12,252,266[8] on the sale.[9]

Thus, we must determine whether petitioner's or respondent's calculation of petitioner's basis in the subsidiaries' stock is correct.[10] Because petitioner filed consolidated returns, our analysis involves the law governing such returns.

Pursuant to section 1502, Congress has given the Secretary of the Treasury broad authority to prescribe regulations with respect to the making of consolidated returns, as follows:

The Secretary shall prescribe such regulations as he may deem necessary in order that the tax liability of any affiliated group of corporations making a consolidated return and of each corporation in the group, both during and after the period of affiliation, may be returned, determined, computed, assessed, collected, and adjusted, in such manner as to clearly reflect the income tax liability and the various factors necessary for the determination of such liability, and in order to prevent avoidance of such tax liability.

---

[7]The amount realized by petitioner from WDS in the sale, excluding the sale of an aircraft for $88,000, was (a) the sum of (i) $30,032,000 in cash, (ii) the assumption of non-tax liabilities of $1,126,513, and (iii) the Federal and State tax liabilities assumed by WDS reduced by (b) expenses attributable to the sale of $295,005.47. If petitioner's calculations of its basis in the stock of the subsidiaries is correct, then the Federal and State tax liabilities assumed by WDS in the sale total $333,080 and $39,733, respectively. If respondent's calculation of basis is correct, then the Federal and State tax liabilities assumed total $3,385,752 and $456,770, respectively.

[8]Respondent's determination of gain on the sale is greater than the amount by which he decreased petitioner's basis due to the increased amount of liabilities assumed by WDS which in turn increases petitioner's amount realized from the sale.

[9]The parties apparently agree that, if we find for petitioner, then petitioner's gain on the sale is $1,033,041 and, if we find for respondent, petitioner's gain is $11,875,881.

[10]Although the parties filed two briefs in this case, the Court heard oral arguments on Mar. 15, 1985, due to the complex nature of the issue herein. In addition, the Court considered an amicus curiae brief filed by John S. Nolan.

The consolidated return regulations promulgated pursuant to section 1502 provide a detailed and comprehensive set of rules for adjusting the basis of a subsidiary's stock held by a parent corporation. Sec. 1.1502–32, Income Tax Regs. Pursuant to section 1.1502–32(a), Income Tax Regs., either a positive or a negative basis adjustment must be made annually to the basis of such stock in an amount equal to the difference between the required "positive adjustment" and the required "negative adjustment." The primary positive adjustment is "An allocable part of the undistributed earnings and profits of the subsidiary for the taxable year." Sec. 1.1502–32(b)(1)(i), Income Tax Regs. Conversely, the primary negative adjustment is "An allocable part of the deficit in earnings and profits of the subsidiary for the taxable year." Sec. 1.1502–32(b)(2)(i), Income Tax Regs.

Pursuant to section 1.1502–32, Income Tax Regs., petitioner first computed the earnings and profits of the subsidiaries and then used those figures to adjust its basis in the subsidiaries' stock. In computing the earnings and profits of the subsidiaries, petitioner followed section 312(k), which provides that, for purposes of computing the earnings and profits of a corporation for any taxable year beginning after June 30, 1972, the allowance for depreciation (and amortization, if any) shall be deemed to be the amount which would be allowable for such year if the straight-line method of depreciation had been used.[11] Thus, pursuant to section 312(k), petitioner reduced its subsidiaries' earnings and profits only by the amount of straight-line depreciation available rather than the amount of accelerated depreciation actually taken on its consolidated returns.

Petitioner argues that its basis adjustments to the subsidiaries' stock are in accordance with section 1.1502–32, Income Tax Regs., that it correctly followed section 312(k) in calculating the subsidiaries' earnings and profits, and that no further adjustments are required by the consolidated regulations which exclusively govern basis adjustments. Respondent concedes that petitioner properly adjusted its basis in the subsidiaries' stock to reflect the subsidiaries' increase or decrease in earnings and profits. Respondent argues, however, that peti-

---

[11]Sec. 312(k) was originally sec. 312(m) under the Tax Reform Act of 1969, but was redesignated as sec. 312(k) by the Tax Reform Act of 1976.

tioner must further reduce its basis in the subsidiaries' stock for the excess amount of accelerated over straight-line depreciation in order to prevent petitioner from obtaining what respondent perceives to be a "double deduction."[12] Respondent's argument is primarily based on section 1.1016–6(a), Income Tax Regs., which provides that adjustments to basis must always be made to eliminate double deductions or their equivalent, and on *Ilfeld Co. v. Hernandez*, 292 U.S. 62 (1934), wherein the Supreme Court denied the taxpayer what it found to be the practical equivalent of a double deduction.

As noted above, Congress has never attempted to enact technical provisions in this area, but rather has given respondent the power to promulgate regulations which govern all taxpayers who file consolidated returns. Secs. 1501 and 1502. Respondent's consolidated return regulations are legislative in character with the force and effect of law. *Georgia-Pacific Corp. v. Commissioner*, 63 T.C. 790, 801–802 (1975). Such regulations will be followed and not overruled by this Court unless clearly contrary to the will of Congress. *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 503 (1948); *Georgia-Pacific Corp. v. Commissioner, supra* at 801.

Pursuant to his delegated power, respondent has promulgated detailed regulations governing the consolidated return area. Among these is section 1.1502–32, Income Tax Regs., which specifically requires each member of a consolidated group owning stock of a subsidiary to "adjust the basis of such stock" in the manner prescribed therein. Sec. 1.1502–32(a), Income Tax Regs. That regulation specifies that the relevant basis adjustments are to be made by reference to a subsidiary's earnings and profits.

The rule of section 1.1502–32, Income Tax Regs., that basis adjustments are to be made in accordance with earnings and profits, rather than taxable income or loss, was first promulgated in 1966. The history of the regulations reveals that respondent's decision to use earnings and profits was a conscious and deliberate one. Prior to 1966, the regulations did

---

[12]Respondent contends that petitioner has received a double deduction because petitioner and its subsidiaries received a tax deduction for the excess of accelerated over straight-line depreciation, and, on the disposition of its subsidiaries' stock, since petitioner's basis was not reduced by such excess amount, petitioner realized a second tax advantage in the form of a higher basis which resulted in a lower gain on the sale.

not provide for any positive adjustments to a subsidiary's stock, but required a reduction in the basis of a subsidiary's stock measured by the excess of (a) the net operating losses incurred by the subsidiary over (b) the taxable income of the subsidiary against which the net operating losses could have been applied. See sec. 1.1502–34A, Income Tax Regs. Thus, the negative basis adjustment was measured by a subsidiary's taxable losses.

However, on April 30, 1965, the Treasury Department announced that there would be a comprehensive revision of the consolidated return regulations. See T.I.R.-724 (Apr. 30, 1965). When the new consolidated return regulations were first proposed in October 1965, the reduction in basis of a subsidiary's stock was measured by taking the excess of (a) the net operating losses of the subsidiary used by the consolidated group over (b) the earnings and profits of the subsidiary (computed without regard to the subsidiary's net operating losses). Proposed Reg. 1.1502–32, 30 Fed. Reg. 12582 (Oct. 1, 1965). However, this proposed regulation was subsequently withdrawn in September 1966, and a new and different version of section 1.1502–32, Income Tax Regs., was proposed. See 31 Fed. Reg. 11845, 11848 (Sept. 8, 1966). Such version of section 1.1502–32, Income Tax Regs., replaced net operating losses with deficits in earnings and profits as the principal negative adjustment and for the first time provided for a positive adjustment equal to the subsidiary's undistributed earnings and profits for the taxable year. This rule was finally adopted on December 29, 1966, and remains in effect today. See T.D. 6909, 1967–1 C.B. 240, 248.

Respondent chose earnings and profits as the measuring rod for adjusting basis under section 1.1502–32, Income Tax Regs., even though he was well aware that various items and transactions are treated one way in computing taxable income and another way in computing earnings and profits.[13] For

---

[13]In determining a corporation's earnings and profits, its taxable income must be adjusted for: (1) Certain items excluded from taxable income which must be included in earnings and profits such as interest from State and local obligations (see sec. 1.312–6(b), Income Tax Regs.); (2) certain items deducted in computing taxable income which are not deducted in computing earnings and profits such as the sec. 243 dividends received deduction (see sec. 1.312–11(a), Income Tax Regs.), sec. 172 net operating loss deduction (see sec. 1.312–5(d), Income Tax Regs.), and the excess of percentage depletion over cost depletion (see sec. 1.312–6(c)(1), Income Tax Regs.); and (3) certain items that cannot be deducted in computing taxable income which may be deducted in computing earnings and profits such as Federal income taxes, excess charitable contributions, and nondeduct-

example, when section 1.1502–32, Income Tax Regs., was adopted in 1966, a corporation was allowed to deduct the amount of percentage depletion in computing its taxable income, even though it could only reduce its earnings and profits by the lesser amount of cost depletion. See sec. 1.312–6(c)(1), Income Tax Regs. Thus, in the case of a corporation deducting percentage depletion as in the case of a subsidiary using accelerated depreciation, taxable income is reduced by an amount greater than the amount by which earnings and profits are reduced. Nevertheless, despite his awareness in 1966 of the difference between earnings and profits and taxable income, respondent chose earnings and profits as the measuring rod for adjustments to basis and made no special provisions for any differences that did not reduce earnings and profits by the entire amount deducted from taxable income.

Although section 312(k) was not enacted in 1966, respondent was aware of the interplay between that provision and section 1.1502–32, Income Tax Regs., prior to issuing the notice of deficiency in this case.[14] Respondent had previously issued several technical advice memoranda concerning the identical issue with which we are faced, and, in fact, respondent initially concluded that no further basis adjustment in a subsidiary's stock for the excess of accelerated over straight-line depreciation was required, thus agreeing with petitioner's position herein.[15] In 1982, although respondent changed his position to the one he advances herein,[16] he failed to amend his regulations to reflect his new position.

Based upon the foregoing, we conclude that petitioner reached the result mandated by respondent's consolidated return regulations and section 312(k) in computing its basis in the subsidiaries' stock. We believe that judicial interference

---

ible losses (see sec. 1.312–7(b)(1), Income Tax Regs.). See B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 7.03, at 7–16 to 7–23 (4th ed. 1979). See also Rev. Rul. 77–442, 1977–2 C.B. 264.

[14]The notice of deficiency is dated Dec. 21, 1982.

[15]See Technical Advice Memoranda 8206034 (Sept. 12, 1980), 8047027 (Aug. 26, 1980), 7946008 (July 27, 1979), and 7839030 (June 27, 1978). We note that private letter rulings and technical advice memoranda may not be cited for their precedential value, but they "do reveal the interpretation put upon the statute by the agency charged with the responsibility of administering the revenue laws" and may provide "evidence" that such construction "is compelled by the language of the statute." Hanover Bank v. Commissioner, 369 U.S. 672, 686–687 (1962). See sec. 6110(j)(3).

[16]See Technical Advice Memorandum 8302014 (Sept. 30, 1982).

sought by respondent is not warranted to alter this result. This Court will apply these regulations and the statute as written. If we were to make a judicial exception with respect to the adjustment for depreciation, we would be opening our doors for respondent every time he was dissatisfied with a certain earnings and profits adjustment.

If respondent believes that his regulations and section 312(k) together cause petitioner to receive a "double deduction," then respondent should use his broad power to amend his regulations. See *Henry C. Beck Builders, Inc. v. Commissioner*, 41 T.C. 616, 628 (1964). Since respondent has not taken steps to amend his regulations, we believe his apparent reluctance to use his broad power in this area does not justify judicial interference in what is essentially a legislative and administrative matter. *Henry C. Beck Builders, Inc. v. Commissioner, supra* (Drennen, J., concurring at page 633).

Moreover, respondent's reliance on *Ilfeld Co. v. Hernandez*, 292 U.S. 62 (1934), in support of his position that we should reduce petitioner's basis by the excess amount of accelerated over straight-line depreciation upon the sale of the subsidiaries' stock, is misplaced. In *Ilfeld Co.*, the Supreme Court disallowed the deduction of a corporation's loss on its investments in two subsidiaries with which it had filed consolidated returns upon the liquidation of the subsidiaries. The Court determined that since there were no applicable regulations to allow the deduction, the taxpayer was not entitled to one because it already had the benefit in prior years of offsetting against its income the operating losses of the subsidiaries without reducing its basis in the stock of the subsidiaries. The Supreme Court stated, however, that "in the absence of a provision in the Act or regulations that fairly may be read to authorize it, the deduction claimed is not allowable." *Ilfeld Co. v. Hernandez, supra* at 66. Section 1.1502–32, Income Tax Regs., however, deals comprehensively with this problem by requiring in paragraph (b)(2)(i) that the basis of the stock of the loss subsidiary in the hands of the parent be reduced by any deficit in the earnings and profits. That regulation also prevents a double inclusion in income by providing in paragraph (b)(1)(i) that the basis of the subsidiary's stock be increased by the subsidiary's undistributed earnings and profits. Thus, even assuming petitioner is receiving a double

deduction, we believe that the detailed rules in section 1.1502–32, Income Tax Regs., which were prescribed to comprehensively address the problem in *Ilfeld Co.*,[17] together with section 312(k), can fairly be read to authorize the result herein, and, therefore, *Ilfeld Co.* is inapplicable.

Finally, we do not believe that section 1.1016–6(a), Income Tax Regs., requires a contrary result. That regulation provides as follows: "Adjustments must always be made to eliminate double deductions or their equivalent. Thus, in the case of the stock of a subsidiary company, the basis thereof must be properly adjusted for the amount of the subsidiary company's losses for the years in which consolidated returns were made." We do not believe that the language of section 1.1016–6(a), Income Tax Regs., should be read to override the more specific provisions contained in section 1.1502–32, Income Tax Regs. Section 1.1016–6(a), Income Tax Regs., adopted approximately 10 years prior to respondent's amendment of his consolidated return regulations,[18] does not specify what is the requisite "proper adjustment." We find that respondent prescribed in 1966 the proper adjustment to basis when he promulgated specific adjustment rules in section 1.1502–32, Income Tax Regs., and chose earnings and profits to be the exclusive measuring rod. Thus, the "proper adjustment" required by section 1.1016–6(a), Income Tax Regs., is that set forth in section 1.1502–32, Income Tax Regs., which bases the adjustment solely on earnings and profits.

Thus, pursuant to section 1.1502–32, Income Tax Regs., we conclude that petitioner correctly adjusted its basis in the subsidiaries' stock based on the subsidiaries' earnings and profits, which were reduced only by the amount of straight-line depreciation pursuant to section 312(k). Accordingly, no further negative adjustment to petitioner's basis is required.

To reflect concessions and the foregoing,

*Decision will be entered under Rule 155.*

---

[17]See *Covil Insulation Co. v. Commissioner*, 65 T.C. 364, 376 (1975); see also *Garvey, Inc. v. United States*, 1 Cl. Ct. 108, 113 n. 9 (1983), affd. 726 F.2d 1569 (Fed. Cir. 1984).

[18]See 1957–2 C.B. 463, 505.

Reviewed by the Court.

STERRETT, GOFFE, WILBUR, CHABOT, NIMS, PARKER, WHITAKER, KÖRNER, HAMBLEN, COHEN, CLAPP, SWIFT, JACOBS, GERBER, and WRIGHT, *JJ.*, agree with this opinion.

SIMPSON and SHIELDS, *JJ.*, did not participate in the consideration of this case.

