HARDIMAN, Circuit Judge,
dissenting.
According to the Majority, this case “concerns the continued vitality of the so-called Ilfeld doctrine for interpreting the Internal Revenue Code.” Majority Op. 399. Yet there can be no doubt that Ilfeld retains its vitality as a precedent of the Supreme Court, and Appellant Duquesne Light acknowledges as much. As I see it, the true question presented is whether Ilfeld applies where, as here, a hastily issued regulation authorizes the very actions that Ilfeld cautions against. The answer to that question depends on Ilfeld’s scope, the meaning of the applicable regulations (specifically § 1.337(d)-2T), and the significance of Duquesne’s compliance with those regulations. Because I see those issues differently than my colleagues, I respectfully dissent.
I. The Scope of Ilfeld
Ilfeld seeks to prevent double deductions. To that end, the Supreme Court declared that “the practical equivalent of a double deduction” should not be sanctioned absent “a provision of the Act definitely requiring it.” Charles Ilfeld Co. v. Hernandez, 292 U.S. 62, 68, 54 S.Ct. 596, 78 L.Ed. 1127 (1934). The Majority interprets this language to require the taxpayer to identify three distinct layers of authorization. *418 The first and second layers would require statutory authorization for each of the two deductions, while a third layer would need to provide “explicit approval” for the taxpayer to take both deductions. See Majority Op. 409. That means even if the Code separately allows Deduction A and Deduction B, the taxpayer could not take both deductions unless a provision authorized them to be taken simultaneously. This triple-authorization requirement, I believe, goes above and beyond any rule envisioned by the Supreme Court.
As my colleagues acknowledge, disapproval of double deductions was not Ilfeld’s “case-specific holding.” See Majority Op. 409. In fact, the Ilfeld Court disallowed the taxpayer’s claimed deduction not on these overarching policy grounds, but because the then-applicable regulations prevented the taxpayer from recognizing the second claimed loss. 292 U.S. at 67, 54 S.Ct. 596. In that same vein, other courts have recognized that Ilfeld’s preclusion of double deductions except where “definitely required” was not essential to the Court’s disposition. Cf. Marwais Steel Co. v. Comm’r of Internal Revenue, 354 F.2d 997, 998 (9th Cir. 1965) (“We follow taxpayer’s argument that part of what was there said was dicta.”). And when discussing the actual facts and regulations at issue in the case, the Ilfeld Court seemed to lay down a less rigorous rule, holding that: “In the absence of a provision in the Act or regulations that fairly may be read to authorize it, the deduction claimed ⅛ not allowable.” 292 U.S. at 66, 54 S.Ct. 596 (emphasis added).
Thus,, two distinct standards (“definitely requires” or “fairly may be read to authorize”) can be extracted from Ilfeld. While it is true that the “definitely requires” standard supports the Majority’s triple-authorization rule, the “fairly may be read to authorize” standard suggests something between a watered-down clear statement rule and an interpretive aid. The Majority acknowledges that choosing between these standards is both difficult and crucial. See Majority Op. 407 (explaining that Ilfeld’s standard is “debatable” and that “‘[djefi-nitely requiring’ a provision to authorize a double deduction ... is a very high hurdle”). For the reasons I shall explain, we should adopt the “fairly may be read to authorize” standard.
A.
The disparate standards just mentioned can be harmonized, despite their apparent inconsistency. See, e.g., N.J. Air Nat’l Guard v. Fed. Labor Relations Auth., 677 F.2d 276, 282 (3d Cir. 1982). As a general rule, courts should preclude double deductions unless “definitely requirefd].” Ilfeld, 292 U.S. at 68, 54 S.Ct. 596. And when is a double deduction definitely required? When a statute or regulation “fairly may be read to authorize it.” Id. at 66, 54 S.Ct. 596. The taxpayer lost in Ilfeld because the Court could point to no authority that “purports to authorize double deduction of losses.” Id. at 68, 54 S.Ct. 596 (emphasis added). By requiring merely that the law “purport to authorize” a double deduction, the Court eschewed a reading like the Majority’s triple-authorization rule.
B.
Apart from the language of Ilfeld itself, courts interpreting it have never required the triple authorization that the Majority articulates today. Just a year after Ilfeld was decided, our Court explained that the doctrine prohibits double deductions “except where act and regulation so provide.” Comm’r of Internal Revenue v. Nat’l Casket Co., 78 F.2d 940, 941 (3d Cir. 1935). Thirty years later, we stated that despite an obvious double (or even triple) deduction, we had “no choice ... other than to *419 apply [the applicable provision] literally as it is worded.” Miller’s Estate v. Comm’r of Internal Revenue, 400 F.2d 407, 410 (3d Cir. 1968). We went on to say that “[t]he line of cases cited by the Commission descending from [Ilfeld], and allegedly supporting the rule of tax interpretation that double deductions are not permitted absent express statutory mandate, is merely a variation on the ‘avoid absurd results’ rule.” Id. at 411. We cautioned that “using broad equitable consideration[s], such as preventing multiple deductions, to solve problems raised by a tax statute is a dangerous course.” Id. at 411 n.12.[1] Since this weak embrace, we have not cited Ilfeld.[2]
The Supreme Court’s recent treatment of factually similar cases indicates that any such “clear statement” rule yields in the face of compliance with applicable laws and regulations. In Gitlitz v. Commissioner of Internal Revenue, the shareholders of an S corporation received a double tax benefit by excluding a debt cancellation from their income under one provision (rendering it nontaxable) and then including that same amount when calculating their stock basis through another provision (so that it increased their deductions for losses). 531 U.S. 206, 209-10, 121 S.Ct. 701, 148 L.Ed.2d 613 (2001). Because the shareholders’ deductions complied with sequencing provisions “expressly addressed in the [applicable] statute,” the Supreme Court held that the statute imposed no restriction on the deduction. Id. at 218-19, 121 S.Ct. 701. Without citing to Ilfeld, the majority closed by addressing Ilfeld’s principal concern:
[C]ourts have discussed the policy concern that, if shareholders were permitted to pass through the discharge of indebtedness before reducing any tax attributes, the shareholders would wrongly experience a “double windfall”: They would be exempted from paying taxes on the full amount of the discharge of indebtedness, and they would be able to increase basis and deduct their previously suspended losses. Because the Code’s plain text permits the taxpayers here to receive these benefits, we need not address this policy concern.
Id. at 219-20, 121 S.Ct. 701 (citation omitted).
I find it significant that the only citation to Ilfeld in the Gitlitz case was in Justice Breyer’s lone dissent. He opined that the statute was ambiguous and should be interpreted in favor of “closing, not main *420 taining, tax loopholes.” Id. at 223, 121 S.Ct. 701 (Breyer, J., dissenting). And he lamented the fact that “[the majority’s] interpretation of the Code results in the ‘practical equivalent of [a] double deduction.’ ” Id. at 224, 121 S.Ct. 701 (quoting Ilfeld, 292 U.S. at 68, 54 S.Ct. 596). Like the Majority here, Justice Breyer would have precluded the double deduction because he could find no “clear declaration of intent by Congress” to allow it. Id.
Thus, the Gitlitz Court broke along the same theoretical lines as we do here. Justice Breyer’s view of Ilfeld’s scope would have required an explicit authorization in the Code allowing for both tax benefits to be reaped simultaneously. See id. The eight-justice majority, on the other hand, was satisfied that the combined provisions “permit[ted] the taxpayers to receive the[ ] benefits,” without requiring an additional statement that the two benefits could be concurrently utilized.[3] Id. at 220, 121 S.Ct. 701. It goes without saying that we must adhere to the opinion of the Court. And Gitlitz’s “permit” standard is quite closer to my “fairly may be read to authorize” standard than it is to the Majority’s triple-authorization rule.
C.
Next, the Majority’s triple-authorization test should be rejected because reasonable minds can differ as to when and how it would be satisfied. The decision of the Tax Court in Woods Investment Co. v. Commissioner of Internal Revenue, 85 T.C. 274 (1985), is instructive in this regard. The Majority cites Woods as a case that clears Ilfeld’s “high hurdle.” See Majority Op. 407-08, 410-11. I cannot agree. Woods involved the interplay of a regulation and statute that, when applied simultaneously, could result in a double deduction. As the Majority explained:
[Section] 1.1502-32 required the parent to adjust its basis in line with the subsidiary’s earnings and profits, and 26 U.S.C. § 312(k) required the parent to calculate those earnings and profits using a straight-line method of depreciation. Despite its awareness of the potential for straight-line depreciation to result in the practical equivalent of a double deduction, the IRS had failed to amend § 1.1502-32 for almost twenty years.
Majority Op. 411. It is difficult to understand how Woods — where the IRS was aware of the potential of a loophole but failed to amend the scheme — is one where an on-point statute and an on-point regulation provide “explicit approval for duplicating the underlying economie'Toss,” as the Majority claims is necessary under Ilfeld. Majority Op. 409. If Woods passes muster, the Majority’s test is meaningless. Presumably for that reason, the Woods court did not make such a claim. Rather, it primarily relied on Ilfeld’s other standard — the “fairly may be read to authorize” standard that I advocate here — and wrote that the taxpayer should prevail because the regulations and statute “can fairly be read to authorize the result herein.” 85 T.C. at 283.
*421 One final point of policy is worth mentioning: If we were to adopt the “fairly may be read to authorize” standard, we would not be opening the double-deduction floodgates. For example, I agree with the Majority’s excellent analysis that § 165 does not authorize a double deduction. See Majority Op. 409-10 (noting, among other things, that the language of § 165 “allows a single deduction for a single loss” and that the Court in Ilfeld rejected a similar provision). In fact, the Majority’s careful parsing of § 165 is just what the “fairly may be read to authorize” standard encourages — an examination of the text, history, and scheme to see whether the taxpayer’s interpretation is a fair one.[4]
II. The On-Point Regulations
The Majority does not dispute that Du-quesne’s returns complied with the applicable regulations: § 1.1502-32 (basis calculation) and § 1.337(d)-2T (loss allowance). Majority Op. 410. The meaning of those regulations is a point of contention, however.
A. Section 1.337(d)-2T
Section 1.337(d)-2T says in paragraph (a)(1): “No deduction is allowed for any loss recognized by a member of a consolidated group with respect to the disposition of stock of a subsidiary.” Paragraph (c)(2) qualifies this rule by stating that the “[l]oss is not disallowed under paragraph (a)(1) of this section ... to the extent the taxpayer establishes that the loss or basis is not attributable to the recognition of built-in gain.”[5]
Section 1.337(d)-2T’s quadruple-negative construction leaves much to be desired, but its clumsy syntax doesn’t absolve us from enforcing it as written. Specifically, the provision says that losses such as the one Duquesne took here are “not disallowed.” While the Majority claims this language does not positively authorize any deductions, I read it differently. My disagreement with the Majority on this score is simple: “not disallowed” can be read fairly to mean “allowed.” It has long been a convention of the English Language — as with arithmetic and logic — that two negatives make a positive. See, e.cj., Robert Lowth, A Short Introduction to English Grammar: With Critical Notes 162 (1762) (“Two Negatives in English destroy one another, or are equivalent to an Affirmative.”); Henry Watson Fowler, A Dictionary of Modem English Usage 374 (1926) (“You may treat a double negative expression as though it were formally as well as virtually a positive one.”). And the convention remains prevalent today, both in formal writing and in the vernacular. See, e.g., Martha Rose Shulman, Focaccia: One Basic Bread, Endless Delicious Options, N.Y. Times, May 13, 2013 (“Focaccia is a flatbread, not unlike a very thick-crusted pizza”); Tad Friend, Blowback, New Yorker, Oct. 25, 2010 (“He grinned, seeming not displeased to be complicating the issue.”); Tom Jones, It’s Not Unusual, on Along Came Jones (Decca Records 1965) (explaining that “it’s not unusual” to do vari *422 ous everyday activities, such as “to go out at any time”).
If one accepts that “not disallowed” can reasonably be interpreted to mean “allowed,” then § 1.337(d)-2T — having been reduced from a quadruple negative to a double negative — becomes clearer. The combination of paragraphs (a)(1) and (c)(2) would read something like this: “No deduction is allowed for any loss recognized with respect to the disposition of stock of a subsidiary; however, that deduction is allowed to the extent the taxpayer establishes that the loss or basis is not attributable to the recognition of built-in gain.” Put more simply, a subsidiary’s stock loss is allowed unless it relates to a built-in gain. It is undisputed that Duquesne would meet this standard.
The • Majority acknowledges that the foregoing Interpretation results when § 1.337(d)-2T is “literally applied,” but claims that “[w]e know” this literal interpretation cannot be correct because it conflicts with an IRS notice issued alongside § 1.337(d)-2T. Majority Op. 414-15. Specifically, the Majority gives great weight to the IRS’s statement that it “believe[s] that a consolidated group should not be able to benefit more than once from one economic loss.” Id. (quoting IRS Notice 2002-18, 2002-1 C.B. 644 (Mar. 9, 2002)).
I see three principal issues with the Majority’s reliance on this notice. First, the full context of the language quoted by the Majority shows that the IRS did not mean to imply that § 1.337(d)-2T — or any part of the then-in-effect regulatory scheme — prevented the deductions taken by Duquesne. Rather, the IRS’s belief that “a consolidated group should not be able to benefit more than once from one economic loss” was the impetus for its forthcoming regulations, namely, 1.1502-35T:
These rules [§§ 1.337(d) and 1.1502] do not disallow stock loss that reflects net operating losses or built-in asset losses of a subsidiary member. Nonetheless, the IRS and Treasury believe that a consolidated group should not be able to benefit more than once from one economic loss. Accordingly, the IRS and Treasury intend to issue regulations that will prevent a consolidated group from obtaining a tax benefit from both the utilization of a loss from the disposition of stock (or another asset that reflects the basis of stock) and the utilization of a loss or deduction with respect to another asset that reflects the same economic loss.
I.R.S. Notice 2002-18 (March 9, 2002). Thus, the IRS identified a defect in its regulations and explained that it would take corrective action to cure that defect. If anything, this shows that the IRS — at the time Duquesne took its deductions— did not believe there was a regulatory mechanism in place to prevent a double deduction.
Second, even if the IRS notice meant what the Majority claims it does, I would not afford it such deference. While the IRS may “believe that a consolidated group” should never receive a double deduction, id. (emphasis added), the IRS must do more than believe something for it to, become law. See generally 5 U.S.C. §§ 551-559 (The Administrative Procedure Act). No matter what the IRS says in its informal notice publications, it cannot alter the plain meaning of its regulations. To allow otherwise would frustrate the scheme of the Administrative Procedure Act, essentially permitting the IRS “to create de facto a new regulation” through the back door. Christensen v. Harris Cty., 529 U.S. 576, 588, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). “Making regulatory programs effective is the purpose of rulemaking, in which the agency uses its ‘special expertise’ to formulate the best rule. But the *423 purpose of interpretation is to determine the fair meaning of the rule. ... Not to make policy, but to determine what policy has been made and promulgated by the ageney[.]” Decker v. Nw. Envtl. Def. Ctr., 568 U.S. 597, 133 S.Ct. 1326, 1340, 185 L.Ed.2d 447 (2013) (Scalia, J., concurring in part and dissenting in part).
And third, the Majority’s reliance on this IRS notice goes over and above any canon of judicial deference to agency interpretation. In this respect, it’s important to ask: what authority was' the IRS interpreting to support its view that all double deductions should be disallowed? The IRS does not claim to be “implementing a statute,” so we know that it is not entitled to Chevron or Skidmore deference. See United States v. Mead, 533 U.S. 218, 227-28, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). And since the IRS concedes that §§ 1.337(d) and 1.1502 did not disallow these deductions, its belief could not have been derived from those regulations — and therefore is not entitled to deference under Auer v. Robbins, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (holding that an agency’s interpretation of its “own regulations” is entitled to deference). Rather, the Majority seems to claim that the IRS notice was a gloss on Ilfeld itself, writing that the notice shows that Du-quesne’s approach fails “so long as there is Ilfeld." Majority Op. 415.1 am aware of no caselaw that demands (or permits) a court to give such deference to an agency’s position regarding the status or strength of judicial precedent. Nor do I see any principled reason to do so. After all, “[i]t is emphatically the province and duty of the judicial department to say what the law is.” Marbury v. Madison, 5 U.S. (1 Crunch) 137, 177, 2 L.Ed. 60 (1803).
B.
Linguistics aside, the Majority’s reading of § 1.337(d)-2T is inconsistent with the IRS’s comprehensive regulatory scheme. The Majority argues that “the blinkered approach of Duquesne,” ie., that it was entitled to follow the regulations that were before it, “does not stand so long as there is Ilfeld.” Majority Op. 415. But it seems unnatural for the IRS to write a regulation that literally authorizes a specific action, only to expect taxpayers to appreciate that the regulation is undermined by common-law doctrines lurking in the shadows. And this interpretation would seem to vitiate the need for much of the IRS’s prior and subsequent regulations. Why have § 1.337(d)-2T or § 1.1502-32 in place if Ilfeld is the panacea for all consolidated-return, double-deduction ills?
Indeed, if Ilfeld carried such weight, many IRS regulations promulgated during the past several decades would be rendered superfluous. For example, after Woods, the IRS overhauled the consolidated return rules that had permitted the taxpayer to prevail in that case. T.D. 8560, 1994-2 C.B. 200 (Aug. 15,1994). Surely this reform was not just busywork. And after Rite Aid, the IRS scrambled to implement temporary regulations and warned taxpayers that it would soon adopt permanent ones to “prevent duplication of losses within a consolidated group on dispositions of member stock.” IRS Notice 2002-18, 2002-1 C.B. 644 (Mar. 9, 2002). It seems unlikely that the IRS would warn taxpayers that it would soon pass regulations to ban that which was already banned.
Finally, the Majority counters that the temporary regulations created a “gap” that Duquesne exploited. Majority Op. 416-17. But the regulations were not so porous. Section 1.337(d)-2T explicitly addresses the scenario that occurred here— losses by a consolidated group incurred on “disposition of stock of a subsidiary” — and then describes which losses are disallowed *424 (those based on built-in gains) and which losses are not disallowed (those for which the “taxpayer establishes that the loss or basis is not attributable to the recognition of built-in gain”). This is a “gap” only in some philosophical sense. Because of the interstitial nature of regulatory schemes, not every factual permutation will be specified in the law. But a “gap” doesn’t exist whenever an on-point regulation inadvertently authorizes a result that the agency later comes to regret.
C. Section 1.1502-35T
Section 1.1502-35T doesn’t affect the meaning, of § 1.337(d)-2T. The Majority argues that § 1.1502-35T was the regulation actually intended to prevent Du-quesne’s double deductions but “failed to prevent a double deduction here because of how the Duquesne group structured the relevant transactions in the wake of Rite Aid.” Majority Op. 414. But it doesn’t matter that § 1.1502-35T would — under a different set of facts — disallow deductions like the ones Duquesne took here. After all, neither the Tax Court nor the Government claims that § 1.1502-35T precluded the- deductions actually taken by Duquesne in the relevant time period. And the Majority concedes that Duquesne “complied with § 1.1502-35T in the sense that it did not violate it.” Majority Op. 414. I would require no more.
In this regard, the Majority seems to criticize Duquesne for acting during the Rite Aid interregnum. But it matters not whether “[t]he only purpose of [Duquesne] here was to escape taxation.... The fact that [Duquesne] desired to evade the law, as it is called, is immaterial, because the very meaning of a line in the law is that you intentionally may go as close to it as you can if you do not pass it.” Superior Oil Co. v. Mississippi ex rel. Knox, 280 U.S. 390, 395-96, 50 S.Ct. 169, 74 L.Ed. 504 (1930). Duquesne was entitled to order its “affairs that [its] taxes shall be as low as possible;” and was “not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one’s taxes.” Helvering v. Gregory, 69 F.2d 809, 810 (2d Cir. 1934) (Hand, J.) (citations omitted). For that reason, I disagree with my colleagues’ implication that Duquesne should have accommodated the IRS by executing its transaction at a time when the regulatory scheme was more favorable to the Government.
III. Duquesne’s Compliance
The foregoing discussion establishes (hopefully) that: (1) Rfeld yields to a law that can fairly be read to authorize a double deduction; and (2) § 1.337(d)-2T can fairly be read to authorize a double deduction. These propositions lead ineluctably to the conclusion that, by complying with § 1.337(d)-2T, Duquesne’s deductions did not run afoul of Rfeld.
A.
The Majority’s analysis is not so straightforward, looking as it does to the “structure and purpose of the broader regulatory regime,” Majority Op. 412, instead of the language of § 1.337(d)-2T. In that regard, I have no quarrel with the Majority’s convincing argument that Duquesne’s reading of § 1.337(d)-2T runs contrary to the provision’s context and broad purposes. “Let us not forget, however, why context matters: It is a tool’ for understanding the terms of the law, not an excuse for rewriting them.” King v. Burwell, — U.S. -, 135 S.Ct. 2480, 2497, 192 L.Ed.2d 483 (2015) (Scalia, J., dissenting). And “even the most formidable argument concerning [a law’s] purposes could not overcome the clarity [found] in the [law’s] text.” Kloeckner v. Solis, 568 U.S. 41, 133 S.Ct. 596, 607 n.4, 184 L.Ed.2d 433 *425 (2012); see also Hanover Bank v. Comm’r of Internal Revenue, 369 U.S. 672, 687, 82 S.Ct. 1080, 8 L.Ed.2d 187 (1962) (“[W]e are not at liberty, notwithstanding the apparent tax-saving windfall bestowed upon taxpayers, to add to or alter the words employed to effect a purpose which does not appear on the face of the statute”).
Section 1.337(d)-2T may not be a model of clarity, but its tortured prose does not necessarily beget ambiguity. When the IRS writes that a deduction is “not disallowed,” we should accept that it is not. And without that ambiguity, it is not our place to investigate the structure and purpose of the scheme in order to restyle the language of the regulation. See Cent. Tr. Co., Rochester, N.Y. v. Official Creditors’ Comm. of Geiger Enters., 454 U.S. 354, 359, 102 S.Ct. 695, 70 L.Ed.2d 542 (1982) (“It is elementary that the meaning of a [law] must, in the first instance, be sought in the language in which the [law] is framed, and if that is plain, ... the sole function of the courts is to enforce it according to its terms.” (quoting Caminetti v. United States, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917))).
Nor does the seemingly unfair result mean that we should ignore § 1.337(d)-2T’s text. Duquesne’s duplicative deductions “would show only that the statutory scheme contains a flaw; they would not show that [§ 1.337(d)-2T] means the opposite of what it says.” King, 135 S.Ct. at 2503 (Scalia, J., dissenting). And we are not at liberty to revise a regulation “just because the text as written creates an apparent anomaly.” Michigan v. Bay Mills Indian Cmty., — U.S. -, 134 S.Ct. 2024, 2033, 188 L.Ed.2d 1071 (2014).
Perhaps the Majority’s forecast of the IRS’s intent is correct and § 1.337(d)-2T’s plain meaning is inadvertent. That’s beside the point. If the IRS “enacted into law something different from what it intended, then it should amend the [law] to conform it to its intent. It is beyond our province to rescue [lawmakers] from [their] drafting errors, and to provide for what we might think ... is the preferred result.” Lamie v. U.S. Tr., 540 U.S. 526, 542, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) (internal quotations and citation omitted).
B.
Until today Ilfeld had never displaced both the Code and the relevant regulations that allowed the double deduction at issue. In fact, Ilfeld itself suggests that it would give way to permissive regulations. See 292 U.S. at 68, 54 S.Ct. 596 (“There is nothing in the Act that purports to authorize double deduction of losses or in the regulations to suggest that the [IRS] construed any of its provisions to empower [the IRS] to prescribe a regulation that would 'permit consolidated returns to be made on the basis now claimed by [the parent].” (emphases added)). The deductions in Ilfeld violated the existing regulations, which was the basis of the decision. Id. at 67, 54 S.Ct. 596.
Nor do any other Supreme Court cases make such a leap. See McLaughlin v. Pac. Lumber Co., 293 U.S. 351, 355-56, 55 S.Ct. 219, 79 L.Ed. 423 (1934) (holding that the claimed deductions were inconsistent with the governing statute, where no on-point regulations permitted the duplicative deductions); United States v. Skelly Oil Co., 394 U.S. 678, 683-84, 89 S.Ct. 1379, 22 L.Ed.2d 642 (1969) (ruling against the taxpayer who did not refer to an on-point regulation — just to a bare, general Code provision that the Court interpreted, under Ilfeld, not to allow double-dipping). The same goes for our decisions applying Ilfeld in National Casket and Greif Cooperage: in neither case did an on-point regulation actually permit the double deduction challenged by the IRS. See Nat’l Casket, 78 *426 F.2d at 942 (offering the qualification: except where act and regulation so provide, double deduction of the same losses ... is not permissible” (emphasis added)); Greif Cooperage Corp. v. Comm’r of Internal Revenue, 85 F.2d 365, 365 (3d Cir. 1936).
To the contrary, courts have set Ilfeld aside where, as here, two separate provisions combine to (perhaps accidentally) authorize . the taxpayer’s double deduction. See Gitlitz, 531 U.S. at 219-20, 121 S.Ct. 701 (explaining that a taxpayer may receive a “double windfall” because the “Code’s plain text” contained separate provisions that “permitted” taxpayers to “be exempted from paying taxes on the full amount of the discharge of indebtedness and [to] be able to increase basis and deduct their previously suspended losses”); Woods, 85 T.C. at 282 (“If respondent believes that his regulations and section 312(k) together cause petitioner to receive a ‘double deduction,’ then respondent should use his broad power to amend his regulations.”).
[[Image here]]
Duquesne concedes that it took a double deduction. Although that action might be criticized on policy grounds, it complied with the laws and regulations applicable at the time. For that reason, I respectfully dissent.

. The Majority says our holding in Miller "distinguished Ilfeld on the ground that it concerned the peculiar income tax context of consolidated corporate income tax reporting.” Majority Op. 408 (internal quotations omitted). This reading of Miller ignores its primary holding that we must apply the law "literally as it is worded" and seizes on an additional reason provided by the court to distinguish Ilfeld. Miller, 400 F.2d at 411 ("In addition, this tax rule’ has rarely been applied outside the peculiar income tax context of consolidated [returns].” (emphasis added)). In fact, the language quoted by the Majority was not meant to reaffirm Ilfeld in the consolidated returns context, but to express skepticism toward the rule generally, as indicated by the Miller court's use of scare quotes as a rhetorical device. See id.

. Our sister courts have taken a similarly modest view of Ilfeld's scope. See Transco Expl. Co. v. Comm’r of Internal Revenue, 949 F.2d 837, 841 (5th Cir. 1992) ("[Ilfeldl is only an interpretive principle. It does not require or license us to rewrite the Code or the Secretary’s regulations. This court and others have balked in the past at revision of the tax code to reach what appears to be a more sensible result.”); Textron, Inc. v. United States, 561 F.2d 1023, 1026 (1st Cir. 1977). But cf. Marwais Steel Co., 354 F.2d at 998 (applying Ilfeld even though "the argument of [the taxpayer] is very difficult to answer [and] seems near perfect in logic[, because] in human experience, most logic can be carried only so far”).

. The Majority notes that the Court in Gitlitz "did not purport to overrule [Ilfeld]." Majority Op. 408. This makes sense, given that the two cases are perfectly consistent. Each indicates that the judiciary’s policy concern of precluding double deductions must yield to positive law that provides otherwise. The Majority finds support in the fact that the Gitlitz majority "did not so much as mention” Ilfeld. Id. However (as noted above), the Gitlitz majority felt that it "need not address [the] policy concern” of duplicative benefits (i.e., the Ilfeld doctrine) and the citation to Ilfeld by Justice Breyer in dissent emphasizes Ilfeld’s applicability to the case. 531 U.S. at 219-20, 121 S.Ct. 701.

. The preceding section hopefully makes clear that, contrary to the Majority’s claim, I do not interpret Ilfeld. to permit double deductions merely “when they [are] not explicitly banned.” Majority Op. 415. A double deduction is not authorized by silence; rather it is allowed when a statute or regulation "fairly may be read to authorize” it. See Ilfeld, 292 U.S. at 66, 54 S.Ct. 596.

. In my view, the Majority’s discussion of § 1.337(d)-2T was off track from the outset because its triple-authorization standard obliges the regulation to bear much more weight than the caselaw demands for the reasons I described in Part I. What is actually demanded of § 1.337(d)-2T is that it can reasonably be interpreted (i.e., read fairly) to mean what the taxpayer claims it means.